**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALISON MYERS, an individual | ) | FILED: JUNE 25, 2008 |
| | ) | 08CV3619 |
| Plaintiff, | ) | JUDGE HART |
| | ) | MAGISTRATE JUDGE KEYS |
| v. | ) **Case No.** | |
| | ) | |
| BP AMERICA, INC., a Delaware | ) **Jury Demand** | TC |
| corporation, BP PRODUCTS NORTH | ) | |
| AMERICA, INC., a Maryland corporation | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

NOW COMES Alison Myers ("Ms. Myers"), through her attorneys, Synergy Law Group, L.L.C. and for her Complaint against BP PRODUCTS NORTH AMERICA, INC. ("BP Products"), and BP AMERICA, INC. ("BP America," both entities collectively referred to as "Defendants"), states as follows:

### NATURE OF THIS ACTION

1.    This is an action against Defendants for sex discrimination and retaliation in violation of the Title VII of the Civil Rights Act of 1964 42 U.S.C.S. §2000(e) *et seq.*; violation of the Equal Pay Act 29 U.S.C.S. §201 *et seq.*; and breaches of contracts.

### PARTIES

2.    Plaintiff, Alison Myers, is an Irish citizen and permanent resident of the United States residing in Cook County Illinois.

3.    BP Products is a Maryland corporation that is authorized to transact business in Illinois and maintains an office in DuPage County, Illinois at 28100 Torch Parkway, Warrenville 60555.

4.     BP America is a Delaware corporation that is authorized to transact business in Illinois and maintains its principal office in DuPage County, Illinois at 28100 Torch Parkway, Warrenville 60555.

### JURISDICTION AND ADMINISTRATIVE COMPLIANCE

5.     This action arises under the laws of the United States, specifically Title VII of the Civil Rights Act of 1964 42 U.S.C.S. §2000(e) *et seq.* and the Equal Pay Act 29 U.S.C.S. §201 *et seq.*

6.     This Court has jurisdiction over this entire action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343(a)(3), and 42 U.S.C. §2000e-5(f)(3) because this is a civil action with claims arising under the laws of the United States, and because all of the other claims included in the Complaint are so related to the federal claims within this Court's original jurisdiction that they form part of the same case or controversy pursuant to 28 U.S.C. §1367.

7.     Venue is proper in this Court because Defendants operate offices in this District, specifically in DuPage County, Illinois and the activities that gave rise to the claims contained in this Complaint occurred in this District.

8.     On October 29, 2007 Ms. Myers filed a charge of discrimination with United States Equal Employment Opportunity Commission ("EEOC") against "British Petroleum Products North America, Inc." asserting the acts of discrimination alleged in this Complaint. (A true and correct copy of the Charge of Discrimination and Bill of Particulars is attached as Exhibit A).

9.     On April 28, 2008 Ms. Myers filed an Amended Charge of Discrimination with the EEOC amending the charge to name "BP Products of North America, Inc." and "BP America, Inc." (A true and correct copy of the Amended Charge of Discrimination and Bill of Particulars is attached as Exhibit B).

10.    On June 10, 2008 the EEOC issued a Notice of Right to Sue, which was received by Ms. Myers on June 16, 2008.  (A true and correct copy of the Notice of Right to Sue is attached as Exhibit C).

FACTS COMMON TO ALL COUNTS

A.    **Ms. Myers Shows Early Signs Of Promise While Working For BP**

11.    On November 11, 1996 Ms. Myers began working for BP p.l.c. ("BP") as an Operator at BP's London headquarters.  An Operator is essentially a scheduler for the shipments of petroleum products BP buys and sells on a recurring basis.

12.    On January 8, 1998 BP appointed Ms. Myers to the position of Western Crude Oil Trader which became effective on March 1, 1998.

13.    The term "trader" within the BP organization means an agent of BP who buys and sells a product in order to maximize profits on BP's resources.

14.    "Book", "Book Leader" and "Co-Book Leader" are all terms used within the BP organization.  Defendants use the term "Book" to refer to a list of all current trading positions and other information related to each particular trading group.  Trading groups are referred to, within the BP organization, as "benches".  Defendants use the term "Book Leader" and "Co-Book" leader to refer to the heads or co-heads of any particular Book.

15.    On July 8, 1999 BP promoted Ms. Myers to the position of Senior Crude Oil Trader.  This employment relationship was memorialized in an employment agreement called a Trader Fixed Term Employment Contract.  This Fixed Term Employment Contract expired automatically, by its own terms, on December 31, 2000.

**B.    Ms. Myers' Performance Increases Dramatically While Defendants Discriminatory Practices Come To Light**

16.     In September of 2000 BP transferred Ms. Myers to its Warrenville, Illinois office. In Illinois she continued to work as a crude oil trader as a member of the West African Crude Oil Bench which is known colloquially within the BP organization as the "WAF" Crude Oil Bench ("WAF Bench").

17.     From 2001-2002, there were three members on the WAF Bench: Ms. Myers, who was a senior trader, a male trader junior to Ms. Myers and a male Book Leader, who was Ms. Myers' supervisor.

18.     In 2003 the male WAF Book Leader was promoted to the position of Book Leader for the "Cushing Book." The Cushing Book is the most profitable crude book in the BP organization. At this time Ms. Myers began working as the WAF "Co-Book Leader".

19.     In 2005 Ms. Myers became the sole WAF Book Leader.

20.     As the WAF Book Leader, Ms. Myers led a team of five traders, including herself. Ms. Myers and one male trader were located in the United States and the three other traders, two males (one of which had worked in the U.S. office until September of 2006) and one female, on the WAF Bench were located in the United Kingdom.

21.     During the years Ms. Myers worked in the Warrenville Illinois office, Ms. Myers' performance results steadily increased as did her monetary compensation.

22.     The total monetary compensation for traders and Book Leaders is made up of two components: An annual salary and a performance based yearly bonus. The salary is paid periodically throughout the year. The bonuses are calculated at the end of each calendar year and are based on both objective and subjective factors. The objective portion of the bonus is based on the performance of the trader's or Book Leader's respective Book. For example,

everyone on the WAF Bench, the traders and Ms. Myers as the Book Leader, all received bonuses based on the total monetary performance of the WAF Book. For each Book, Defendants set certain "benchmarks", essentially monetary reference points, in order to determine the Book's performance. These benchmarks are generally reviewed and/or adjusted on a yearly basis. The subjective portion of the annual performance based bonus is based on what Defendants termed "soft issues". The "soft issues" portion covers, in part, the employee's behavior, attitude, and whether they adhere to Defendants' policies.

23.     Every year as a trader, Co-book Leader and as the WAF Book Leader, Ms. Myers received 100% of the bonus amounts based on these "soft issues". For the 2006 performance year, Ms. Myers' immediate supervisor told her that she had met all of the "soft issue" objectives for 2006 also.

24.     In 2005 Defendants instituted a "bonus retention program" that applied to traders and other highly compensated employees. The program entailed Defendants retaining a portion of the employee's earned bonus which Defendants would then pay out over the following three years.    Since 2005 the retention program applied to employees whose target bonus was $200,000 or greater. If an employee was subject to the bonus retention program, seventy-five percent (75%) of that employee's bonus earned in any given year would be paid to the employee no later than three months following the end of that year. The remaining twenty-five percent (25%) would be paid out in three equal payments over the following three years with an extra payment in the final year (25% of the total retained amount) to account for the time value of the money that was retained. BP has retained money which Ms. Myers earned in the years 2005 and 2006.

25. Between 2003 and 2006, Ms. Myers' performance as, first, a Co-Book Leader, then later, as the WAF Book Leader, improved dramatically by all objective indicators, as evidenced by her compensation for those years. Specifically Ms. Myers' bonus compensation increased as follows:

      a.     2004 bonus compensation increased  32.01% from the prior year;

      b.     2005 bonus compensation increased  75.09% from the prior year;

      c.     2006 bonus compensation increased 105.17% from the prior year.

## C.  Defendants' Promotional Policies Discriminate Against Ms. Myers

26. While Ms. Myers was the WAF Co-Book Leader, the previous male WAF Book Leader, who had been promoted to the position of Cushing Book Leader, left the BP organization, leaving the position of Cushing Book Leader open.

27. On information and belief, Defendants' policies and procedures require related companies within the BP organization to hold open interviewing for current employees wanting to interview for an open position.

28. Ms. Myers, who was a prime candidate to succeed in the position of Cushing Book Leader, was not informed of the open position nor was she allowed to interview for the open position.

29. On information and belief, without holding open interviewing, Defendants quickly appointed a male, junior in trading status to Ms. Myers, to the position of Cushing Book Leader instead of Ms. Myers.

30. Ms. Myers confronted her superior about Defendants' deviation from its policies and procedures that require open interviewing. Ms. Myers was told that she should "just support [the new, male Cushing Book Leader]" because "she was getting paid a lot of money" in her current position.

31.     On information and belief, this inexplicable and discriminatory promotion violated Defendants internal policies and procedures that govern promoting from within the BP organization.

**D.      Defendants' Subjective Bonus Deduction Discriminates Against Ms. Myers**

32.     For the 2006 performance year, based on the overall monetary performance of the WAF Book and the benchmarks set for the WAF Book in her 2006 Performance Contract, Ms. Myers earned a bonus in excess $5.5 million payable in March 2007 subject to the "bonus retention program." This bonus was in addition to Ms. Myers' salary. Ms. Myers' salary for 2006 started at $121,000 and increased to $150,000 on April 1, 2006. In 2007 Ms. Myers' salary increased to $163,500.

33.     Ms. Myers was entitled to receive the full amount of her 2006 performance bonus with the appropriate portion to be held pursuant to the bonus retention program given that she had not been told at any time throughout the year by management that issues existed with respect to any "soft issues" that could affect her bonus. To the contrary, management verbally praised Ms. Myers' leadership of her team and reassured her on several occasions throughout 2006 that none of her "soft issues" were being questioned.

34.     Ms Myers' bonus, according to her 2006 Performance Contract, was to be paid out in March of 2007, with approximately $1.3 million (25%) to be retained by Defendants pursuant to the "bonus retention program."

35.     On March 7, 2007, just days before Defendants were scheduled to pay the bonuses, Defendants told Ms. Myers that they had decided to unilaterally and retroactively change the 2006 WAF Book benchmarks. This retroactive change in the benchmarks for 2006

7

excluded approximately $14,724,078.00 from the WAF Book's performance. This exclusion, in turn, resulted in deduction of $776,720 from Ms. Myers' 2006 bonus.

36.     This retroactive benchmark change presented two major wrongs. First, the fact that Defendants retroactively changed the benchmarks in and of itself was wrong. The WAF Book benchmarks had not changed since 2005. Defendants knew the benchmarks had not been changed for 2006 because the benchmarks are set by Defendants. Defendants, the employees who receive bonuses based on the benchmarks for their respective Book, and Ms. Myers all specifically rely on the benchmarks set each year when setting performance goals for the books. Even after altering the performance benchmarks for the purposes of calculating Ms. Myers' bonus, as of July 2007 Defendants had not altered the WAF Book benchmarks for anyone else on the WAF Bench or for the WAF Book.

37.     The second wrong with respect to the benchmarks is that Defendants retroactively changed the WAF Book's performance benchmarks *only when calculating Ms. Myers'* 2006 bonus. Defendants used the previously established benchmarks for the purposes of determining the WAF Book's performance for all of the other members of the WAF Book Bench. Defendants provided no explanation why they discriminated against Ms. Myers in this way.

38.     Throughout 2005 and 2006 the WAF Book's benchmarks were common knowledge and were frequently discussed as well as the effect the benchmarks would have on the year-end performance calculation for the WAF Book. At no time did Defendants tell Ms. Myers that they planned on or intended to change the WAF Book's benchmarks.

39.     The WAF Book's benchmarks were never changed, at any time, throughout 2006. Only after December 31, 2006, after Defendants received the benefits of Ms. Myers efforts,

8

when Ms. Myers bonus was being calculated, did Defendants retroactively decide that the WAF Book benchmarks needed to be revised.

40.    Defendants retroactively changed the benchmarks only for the purpose of calculating the WAF Book's performance for Ms. Myers' bonus, but not for any other member of the U.S. WAF Bench, all of whom were males.

41.    On March 8, 2007 Ms. Myers questioned Defendants' decision to retroactively change the benchmarks for the WAF Book. (See the email from Alison Myers to Andy Milnes, dated March 8, 2007 ("March 8th Email") attached as Exhibit D).  Ms. Myers met with Defendants' management regarding its discriminatory decision to retroactively change the benchmarks. Ms. Myers' was told only that Defendants' deduction was warranted because, ultimately, they were paying her "what she was worth."

42.    On information and belief, the arbitrary nature of Defendants' determination to retroactively change the WAF Book's benchmarks only for the purpose of calculating Ms. Myers' 2006 bonus is evidenced first by the fact that Defendants did not retroactively change the benchmarks for the purpose of calculating the male WAF Book traders' bonuses; and second by never retroactively changing the benchmarks for other Books within the BP organization, or to reduce the male book leaders' bonuses; and third by not reducing Ms. Myers 2005 bonus although the same benchmarks were used throughout 2005 and when calculating the performance of the WAF Book in 2005.

43.    Defendants singled out Ms. Myers for the retroactive benchmark change and selectively reduced her 2006 bonus solely because she is a woman.

44.    Defendants discriminated against Ms. Myers because she is a woman in other ways as well.  As of July 2007, Ms. Myers was the only female Book Leader at BP Products.

Ms. Myers' compensation, including bonus, was substantially less than the other male Book Leaders employed by Defendants.  On information and belief, Defendants paid the other Book Leaders, all of whom were male, significantly more than the amount Defendants paid Ms. Myers even though other books were neither substantially more qualitatively or quantitatively different than the WAF Book that Ms. Myers led.

## D.    Defendants' Discrimination Continues When They Retaliate Against Ms. Myers

45.    In April of 2007, in retaliation against Ms. Myers' challenging the discriminatory way Defendants retroactively changed the WAF Book's performance benchmarks and subsequently doctored her 2006 bonus calculation, Defendants gave Ms. Myers an unfavorable first quarter review, based not on any objective performance standards but on what Defendants termed "behavior" issues.  This review was a sham and contradicted prior reviews and comments Ms. Myers received on her performance. Just a few weeks earlier, when Ms. Myers' 2007 Performance Contract was negotiated and executed, and her 2006 bonus was being discussed Ms. Myers received favorable feedback regarding her behavior.

46.    Moreover, in the same month of this unfavorable review, April of 2007, Defendants rewarded Ms. Myers' for her "excellent" performance (see a true and correct copy of the Reward Letter dated April 13, 2007 attached as Exhibit E).

47.    At all times while employed by Defendants, first as a trader, and then as the WAF Book Leader, Ms. Myers surpassed Defendants' performance benchmarks every year and in each and every respect.  While employed at Defendant companies, Ms. Myers consistently received praise and positive feedback regarding her job performance from her superiors and co-workers.

48.     The quarterly review Ms. Myers received in May of 2007 was only the second formal written review she received in the entire nine-year span that she worked for Defendants as a trader.

49.     Defendants' unfavorable first quarter 2007 review of Ms. Myers was a pretext, as evidenced by the fact that male members of the WAF Bench and other male Book Leaders were not given unfavorable reviews despite the males engaging in the same, and often times worse, "behaviors" Defendants attempted to attribute to Ms. Myers.

50.     During a meeting on July 10, 2007 (the "July 10th Meeting"), Defendants further retaliated against Ms. Myers. Ms. Myers' immediate supervisor invited her to this meeting to review operational items but instead ambushed Ms. Myers with a meeting that included three of her superiors and a member of Defendants human resources department. The true purpose of this meeting, as detailed below, was in fact to (1) punish Ms. Myers' challenges to Defendants' discriminatory policies, including her own 2006 bonus calculation; (2) prevent Ms. Myers from earning any future bonuses or collecting retained bonus amounts; and (3) prevent Ms. Myers from continuing, in any meaningful employment capacity, with the BP organization.

51.     At this July 10th Meeting Defendants placed Ms. Myers on what Defendants refer to as "garden leave". This "garden leave" status stripped Ms. Myers of all of her job responsibilities, precluded Ms. Myers from continuing in her capacity as the WAF Book Leader (consequently freezing her out of any opportunity to continue to earn and receive a bonus for 2007), prevented Ms. Myers from assuming any other position within the larger BP organization, and search for other employment opportunities outside of the BP organization. On information and belief, Defendants have has never treated a male employee, and particularly not a male Book Leader, placed on "garden leave" in this manner and without any warning or notice.

52.     Also at the July 10th Meeting Defendants demanded that Ms. Myers be repatriated back to the United Kingdom before October 8, 2007.  On information and belief, Defendants do not repatriate fixed term contract traders until their Performance Contracts expire unless both parties agree to do so or the employee requests repatriation.  Ms. Myers' Performance Contract was not scheduled to expire until December 31, 2007.

53.     Defendants' demand that Ms. Myers be repatriated before her 2007 Performance Contract breached the Performance Contract and constituted discrimination and retaliation. Defendants' attempt to repatriate Ms. Myers in the middle of her Performance Contract was motivated by Defendants' desire to discriminate against Ms. Myers based on the fact that she is a female and challenged Defendants' discriminatory employment practices.

54.     In the July 10th Meeting, Defendants promised that during the three month "garden leave" period, BP would provide Ms. Myers access to BP's internal job bank so that she could to seek employment within the BP organization in the United Kingdom.  Despite repeated requests from Ms. Myers for the necessary information to access BP's internal job bank, BP did not contact Ms. Myers until the end of August of 2007.

55.     Immediately following the July 10, 2007 Meeting, Defendants expressly forbade Ms. Myers from returning to her desk to collect her personal items, forbade her from contacting any of the WAF team members and any other employees of Defendants, and then demanded that Ms. Myers be escorted out of the building, through the fire escape, as though she were a criminal.  On information and belief, Defendants have never treated a male employee placed on "garden leave" in this manner.

56.     Defendants also immediately required Ms. Myers' team and broader trading and support groups to cease any and all communications with her, and further required that if Ms.

Myers tried to get in contact with them, they should report this to their line managers immediately. None of these mandates are typical of Defendants' repatriation process and, on information and belief, have never been instituted with respect to any male employees who were repatriated.

57. Not only did Defendants' actions in the July 10th Meeting preclude Ms. Myers from earning a performance bonus for the second half of 2007, Defendants refused, and continue to refuse, to compensate Ms. Myers for the bonus she earned during the first half of 2007. As of July 10, 2007, the WAF Book was on track to at least meet, and in all likelihood exceed, the performance benchmarks reached in 2006. Thus, Ms. Myers' bonus, which Defendants refuse to pay, would have amounted to at least $5.5 million for 2007, at least a substantial portion of which Ms. Myers already earned between January and July 2007. Defendants also refuse to pay Ms. Myers over $2.1 million in retained bonus earnings from 2005 and 2006.

58. Moreover, because the July 10th Meeting was so sudden, unexpected and shrouded in secrecy, Ms. Myers' colleagues, team members, trading partners and others involved in the crude oil market were left speculating the reason for Ms. Myers departure from Defendant companies. This has cast a pall over Ms. Myers reputation within the industry in which Ms. Myers' has operated in for the past 12 years.

59. Potentially, the speculation from the market and the companies regularly involved in the crude oil market could substantially decrease Ms. Myers future earning capacity.

60. On information and belief, Defendants have paid out the retained amounts for males that have left their employment at Defendant companies, even when the departing employee received official, documented, complaints about their behavior.

61.    After being placed on "garden leave" Ms. Myers informed Defendants that she continued to be ready, willing and able to perform all of her job duties as the WAF Book Leader through at least December 31, 2007 if not longer, and that she did not believe Defendants' demand for her repatriation during the middle of her 2007 Performance Contract was justified, either factually or legally.

62.    Even though Ms. Myers informed Defendants that she continued to be ready, willing and able to perform all of her job duties as the WAF Book Leader through at least December 31, 2007 if not longer, Defendants again retaliated against Ms. Myers by terminating her employment on October 18, 2007 and continuing to refuse to allow Ms. Myers to continue in her role as WAF Book Leader or pay any of the bonus monies she was owed.  On information and belief Defendants have never treated any fixed term contract male traders similarly to the way it treated Ms. Myers.

63.    On information and belief, Defendants replaced Ms. Myers as the WAF Book Leader with a male who was less qualified, with less recent market experience in crude oil and less experience with WAF trading specifically.  Defendants wanted to replace Ms. Myers because she is a woman and voiced her objections to Defendants' discriminatory practices.

64.    On information and belief, Defendants' activities described above, specifically its review of Ms. Myers in April of 2007, its placing her on "garden leave" in July of 2007 and its terminating her in October of 2007 were all pretexts for Defendants' true goal, which was to punish Ms. Myers for challenging Defendants' discriminatory practices, including the manner in which Defendants promoted, compensated, disciplined and repatriated Ms. Myers as a female employee.

**COUNT I**
**SEX DISCRIMINATION IN VIOLATION OF TITLE VII**
**OF THE CIVIL RIGHTS ACT OF 1964—29 U.S.C. §2000e, *et seq.***

65.    Ms. Myers adopts and incorporates by reference all allegations contained in ¶¶ 1-64 as if set forth herein.

66.    Title VII prohibits employers from, among other things, discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment because of an individual's race, color, religion, sex, or national origin.

67.    Ms. Myers, a female, falls within a class protected by Title VII.

68.    Title VII §2000e(a) defines and "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such person."

69.    Defendants qualify as "employers" under the Title VII definition.

70.    Ms. Myers was meeting Defendants' business expectations as demonstrated by:

    a.    Her long-term employment with Defendants; Ms. Myers worked for BP and its affiliates for approximately eleven years;

    b.    Her positive reviews from her superiors, the sole exception occurring after she voiced her opinion regarding the discriminatory manner in which Defendants retroactively changed the performance benchmarks for the WAF Book and used the doctored calculations only to reduce Ms. Myers' 2006 bonus;

    c.    Her unblemished history of receiving 100% of all bonus payouts for every performance year before the 2006 performance year even though

Defendants reserved the right to deduct bonus monies because of behavioral issues;

d.      Her exemplary performance both as a trader and the WAF Book Leader, at all times while employed by Defendants in either capacity, she surpassed Defendants' performance benchmarks every year;

71.     Ms. Myers suffered adverse employment actions when Defendants took the following actions:

a.      singling out Ms. Myers for bonus reduction in 2006 of $776,720 based on Defendants' retroactive change of the performance benchmarks for the WAF Book;

b.      retaliating against Ms. Myers for challenging the discriminatory retroactive benchmark changes and subsequent application of the modified benchmarks for the purposes of calculating only Ms. Myers' 2006 bonus;

c.      creating a pretextual issue pertaining to Ms. Myers' "behavior" as a basis for the unfavorable review she received in the first quarter of 2007;

d.      removing Ms. Myers from her position as the WAF Book Leader;

e.      demanding that Ms. Myers repatriate back to the United Kingdom, to take at best a lower level position, before the end of Ms. Myers' 2007 Performance Contract;

f.      being frozen out of the opportunity to earn a bonus through at least December of 2007;

g.      refusing to pay Ms. Myers the amount of bonus monies retained by Defendants which totaled approximately $2.1 million even though

16

Defendants had paid out the retained bonus monies to males despite them having official, documented "behavior" issues;

h.    having Ms. Myers' reputation ruined within the BP organization, and potentially in her chosen field of profession;

i.    forcing Ms. Myers to be physically escorted out of the BP office building following the July 10, 2007 meeting;

j.    refusing to pay Ms. Myers $776,720 of her bonus based on her 2006 performance;

k.    refusing to pay Ms. Myers the bonus she earned during the first half of 2007 and would have continued to earn through 2007;

l.    refusing to pay Ms. Myers for accrued bonuses earned in 2005 and 2006 that Defendants withheld as part its retention program, totaling approximately $2.1 million dollars.

m.    treating male employees similarly situated to Ms. Myers, substantially differently.

72.    Plaintiff, Alison Myers respectfully request the following relief:

a.    actual damages, for back pay and front pay, in an amount to be proven at trial;

b.    compensatory damages in an amount to be proven at trial;

c.    punitive damages in the amount of $25,000,000.00 given Defendants' intentional and willful conduct;

d.    reasonable attorney's fees  and costs for the prosecution of this action;

e.    and such further relief as the Court deems appropriate and just.

## COUNT II
### RETALIATION IN VIOLATION OF TITLE VII
### OF THE CIVIL RIGHTS ACT OF 1964—29 U.S.C. §2000e, *et seq.*

73.    Ms. Myers adopts and incorporates by reference all allegations contained in ¶¶ 1-72 as if set forth herein.

74.    Ms. Myers engaged in statutorily protected speech by questioning, opposing, and complaining of Defendants' compensation discrimination against her as the only female on the U.S. WAF Team.

75.    Ms. Myers questioned and complained specifically of the double standard by which Defendants retroactively changed the WAF Book's performance benchmarks only for the purpose of calculating Ms. Myers' 2006 bonus while not changing the benchmarks, and consequently the WAF Book's total 2006 performance total, for any other fixed term contract traders on the WAF Bench.

76.    As a direct result of Ms. Myers' opposition to Defendants' discriminatory practices, Ms. Myers suffered adverse employment actions including, but not limited to, being forcefully escorted from Defendants' office, being forced to go on garden leave, being ordered to repatriate before her 2007 Performance Contract expired, and being frozen out of the opportunity to earn a substantial bonus for 2007.

77.    Ms. Myers' protected speech was a substantial or motivating factor behind Defendants' adverse employment actions against Ms. Myers, evidenced in part by the following:

        a.    *Suspicious Timing.* Only one month elapsed from when Ms. Myers' questioned the retroactive benchmark change to when Ms. Myers received a negative review citing her "behavior" issues, which included as a behavior issue Ms. Myers' challenge to her 2006 bonus calculation,

although no mention of her "behavior" issues were mentioned only a few weeks earlier when her 2007 Performance Contract was renegotiated. Less than four months elapsed between Ms. Myers challenging Defendants' retroactive benchmark change and when Ms. Myers was placed on garden leave, ordered to repatriate, and frozen out of any opportunity to earn bonus for 2007.

b.    *Unusual Circumstances.* In the nine years Ms. Myers worked in the BP organization and Defendants as a trader she only received two reviews, neither of which included negative feedback pertaining to behavior or anything else but instead praised her consistent, exemplary performance. Yet within weeks of Ms. Myers questioning Defendants' retroactive change in the performance benchmarks for the WAF Book for the purposes of calculating her bonus, Defendants decided to conduct a performance review of Ms. Myers.    This negative review was diametrically opposed to Defendants' representations to Ms. Myers just a few weeks earlier when it negotiated Ms. Myers' 2007 Performance Contract.

c.    *Motivating Factor.* Defendants' sudden urge to review Ms. Myers' performance in April of 2007 was a pretext and the results were fabricated to generate the desired result, an overwhelmingly negative review. The pretextual review specifically critiqued Ms. Myers for questioning Defendants' retroactive benchmark changes and discriminatory

19

application of the benchmark changes and cited Ms. Myers' challenges to

this discriminatory practice as an example of her "behavior problems".

78.    Plaintiff, Alison Myers respectfully request the following relief:

    a.    actual damages, for back pay and front pay, in an amount to be determined at trial;

    b.    compensatory damages in an amount to be determined at trial;

    c.    punitive damages in the amount of $25,000,000.00 given Defendants' intentional and willful conduct;

    d.    reasonable attorney's fees and costs for the prosecution of this action;

    e.    and such further relief as the Court deems appropriate and just.

## COUNT III
## VIOLATION OF THE EQUAL PAY ACT OF 1963—29 U.S.C. §206(d)

79.    Ms. Myers adopts and incorporates by reference all allegations contained in ¶¶ 1-78 as if set forth herein.

80.    The Equal Pay Act ("EPA") prohibits an employer from, among other things, discriminating "between employees on the basis of sex by paying wages to employees ... at a rate less than the rate at which he pays to employees of the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. §206(d)(1).

81.    Defendants qualify as "employers" for purposes of an Equal Pay Act claim.

82.    Ms. Myers' position as the WAF Book Leader was qualitatively identical to the other male Book Leaders' in the Warrenville Illinois office, and in the larger BP organization, because it required equal work, equal skill, equal effort, and equal responsibility, and was performed under similar working conditions.  All the Book Leaders were fairly equal based on their overall skills, efforts, responsibilities, and training.

83.    On information and belief, the male Book Leaders, although equals in all other respects, received higher compensation in terms of their commission rates, for equal work.

84.    On information and belief, male Book Leaders employed by Defendants were paid substantially higher base pays and commission rates than Ms. Myers for their work on other Books that were neither qualitatively or quantitatively different than Ms. Myers' WAF Book.

85.    On information and belief, Ms. Myers' male predecessors who filled the WAF Book Leader position received higher compensation and commissions despite the fact that the WAF Book's performance was significantly lower and the team was smaller.

86.    On information and belief, Ms. Myers' immediate predecessor as the WAF Book Leader earned a higher commission rate than Ms. Myers despite Ms. Myers more than quadrupling the WAF Book's performance over the best efforts of her predecessor.  Ms. Myers was paid less even though she was managing a bigger team, five people as opposed to the three people her predecessor managed.

87.    On information and belief Defendants employed no seniority system at the time that would account for the discrepancies in compensation between Ms. Myers and the male Book Leaders, nor between Ms. Myers and her predecessors.

88.     On information and belief Defendants employed no merit system at the time that would account for the discrepancies in compensation between Ms. Myers and the male Book Leaders, nor between Ms. Myers and her predecessors.

89.     On information and belief Defendants employed no system at the time that measured earnings by quantity or quality of production that would account for the discrepancies in compensation between Ms. Myers and the male Book Leaders, nor between Ms. Myers and her predecessors.

90.     Defendants employed no differentials at the time, based on a factor other than sex.

91.     Plaintiff, Alison Myers respectfully request the following relief:

   a.     actual damages, for back pay and front pay, in an amount to be proven at trial;

   b.     compensatory damages in an amount of to be proven at trial;

   c.     punitive damages in the amount of no less than $25,000,000.00 given Defendant's intentional and willful conduct;

   d.     reasonable attorney's fees and costs for the prosecution of this action;

   e.     any and all further relief as the Court deems appropriate and just.

## COUNT IV
## BREACH OF CONTRACT
### (2007 Performance Contract)

92.     Ms. Myers adopts and incorporates by reference all allegations contained in ¶¶ 1-90 as if set forth herein.

93.     The 2007 Performance Contract between Defendants and Ms. Myers was a valid contract. The 2007 Performance Contract was effective between January 1, 2007 and December 31, 2007.

94.     Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

95.     Until she was forced to leave the Defendants' premises on July 10, 2007, Ms. Myers performed all obligations she owed under her 2007 Performance Agreement with Defendants. Ms. Myers remained ready willing and able to perform all of her obligations under the 2007 Performance Contract but was precluded from doing so because Defendants breached their obligations under the 2007 Performance Contract.

96.     Defendants breached the terms of the 2007 Performance Contract by placing Ms. Myers on "garden leave" when the contract obligates Defendants to allow Ms. Myers to perform as a trader through the end of the 2007 calendar year.

97.     Moreover, there was a course of performance at all times relevant to this lawsuit at Defendants that all Performance Contracts would be allowed to run their full term notwithstanding any written policies, agreements or directives to the contrary.

98.     Defendants breached the terms of the contract by ordering Ms. Myers to repatriate before her 2007 Performance Contract expired on December 31, 2007.

99.     Defendants further breached the terms of the 2007 Performance Contract by officially terminating Ms. Myers on October 18, 2007 before the contract expired.

100.     Defendants further breached the terms of the 2007 Performance Contract by not paying Ms. Myers the full compensation, including Ms. Myers' salary and annual bonus, she was owed under the terms of the Performance Contract.

101.     Ms. Myers respectfully requests the Court to award her actual damages in an amount to be determined at trial and any and all further relief as the Court deems appropriate and just.

## COUNT V
## BREACH OF CONTRACT
### (2006 Performance Contract)

102.    Ms. Myers adopts and incorporates by reference all allegations contained in ¶¶ 1-101 as if set forth herein.

103.    The 2006 Performance Contract between Defendants and Ms. Myers was a valid contract.  The 2006 Performance Contract was effective between January 1, 2006 and December 31, 2006.

104.    Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

105.    Ms. Myers fully performed all of her obligations under the 2006 Performance Contract.

106.    The 2006 Performance Contract provided that Ms. Myers' 2006 target bonus would be "paid out based mainly on the performance of the relevant book" in the amount of $2.33 million.  Further, the 2006 Performance Contract provided that Ms. Myers' target bonus "paid out based on individual performance" would be $1.16 million.

107.    Based on the performance of the 2006 WAF Book, and the terms of the 2006 Performance Contract, Ms. Myers earned a bonus of approximately $5.5 million.

108.    Defendants breached the terms of the 2006 Performance Contract by deducting $776,720 from Ms. Myers 2006 bonus payout.  Defendants never discussed the deduction with Ms. Myers, obtained her consent to the reduction or explained its reasoning to Ms. Myers in advance.  Ms. Myers only became aware of the deduction in 2007 at the time the 2006 bonus was scheduled to be paid out.

109.    Because of Defendants' breach of the 2006 Performance Contract Ms. Myers suffered damages in the amount of $776,204.

110.    Under the terms of the 2006 Performance Contract and its accompanying bonus retention program, Ms. Myers was entitled to receive payouts of $400,000 in 2008 and 2009 and a payout of $700,000 in 2010.

111.    Ms. Myers respectfully requests the Court to award her actual damages in the amount of $2,276,204 and any and all further relief as the Court deems appropriate and just.

## COUNT VI
## BREACH OF CONTRACT
### (2005 Performance Contract)

112.    Ms. Myers adopts and incorporates by reference all allegations contained in ¶¶ 1-111 as if set forth herein.

113.    The 2005 Performance Contract between Defendants and Ms. Myers was a valid contract.  The 2005 Performance Contract was effective between January 1, 2005 and December 31, 2005.

114.    Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

115.    Ms. Myers fully performed her obligations under the 2005 Performance Contract and at the time of her termination from Defendants Ms. Myers was ready, willing and able to continue working for Defendants.

116.    For the performance year 2005, Ms. Myers earned a bonus of $2,658,785.

117.     Pursuant to bonus retention program, Ms. Myers was entitled to receive payouts of $219,350 in 2007 and 2008 and a payout of $385,524 in 2009.  Ms. Myers only received the $219,350 amount from 2007.

118.    Defendants breached the terms of the 2005 Performance Contract by refusing to pay to Ms. Myers the amounts retained from her 2005 performance bonus.

119.    Because of Defendants' breach of the 2005 Performance Contract Ms. Myers suffered damages in the amount of $604,874.

120.    Ms. Myers respectfully requests the Court to award her actual damages in the amount of $604,874 and any and all such further relief as the Court deems appropriate and just.

Dated:  June 25, 2008                                Respectfully submitted,

                                                     ALISON MYERS,
                                                     Plaintiff.

                                                     By:  /s/ Joseph L. Kish_____
                                                          One of Her Attorneys

Joseph L. Kish (ARDC # 6197916)
Trisha M. Cole (ARDC # 6289247)
Synergy Law Group, L.L.C.
730 West Randolph St., 6th Floor
Chicago, Illinois 60661
Phone: (312) 454-0015
Fax: (312) 454-0261

## JURY DEMAND

Plaintiff, Alison Myers, hereby demands trial by jury.

Dated:  June 25, 2008                                    Respectfully submitted,

                                                                        ALISON MYERS,
                                                                        Plaintiff.

                                                                        By:  /s/ Joseph L. Kish
                                                                             One of Her Attorneys

Joseph L. Kish (ARDC # 6197916)
Trisha M. Cole (ARDC # 6289247)
Synergy Law Group, L.L.C.
730 West Randolph St., 6th Floor
Chicago, Illinois 60661
Phone: (312) 454-0015
Fax: (312) 454-0261

# EXHIBIT

# A

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☑ EEOC | |
| | | and EEOC |

| State or local Agency, if any | |
|---|---|

| Name (Indicate Mr., Ms., Mrs.)    Alison Myers | Date of Birth<br>01/27/1972 |
|---|---|

| Street Address    57 E. Delaware, #2806 | City, State and ZIP Code    Chicago, IL 60611 | |
|---|---|---|

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two are named, list under PARTICULARS below.)

| Name    British Petroleum Products North America, Inc. | No. Employees, Members<br>37,000 | Phone No. with Area Code<br>630-836-5000 |
|---|---|---|
| Street Address    28100 Torch Parkway | City, State and ZIP Code    Warrenville, IL 60555-4015 | |

| Name | No. Employees, Members | Phone No. with Area Code |
|---|---|---|
| Street Address | City, State and ZIP Code | |

DISCRIMINATION BASED ON (Check appropriate box(es))

☐ RACE  ☐ COLOR  ☑ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☑ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest    Latest
07/10/2007

☑ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

See Charge of Discrimination Particulars - Alison Myers, attached as Exhibit A.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – When necessary for State or Local Agency Requirements

I declare under penalty of perjury that the above is true and correct.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

10/29/07
Date

Alison Myers
Charging Party Signature

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE

## CHARGE OF DISCRIMINATION: PARTICULARS

### ALISON MYERS

I began working for British Petroleum (BP) at its London headquarters in 1996. My initial position was as an Operator. I progressed to the position of trader in 1998. In 2000 BP transferred me to Warrenville, Illinois where I continued my role for British Petroleum North America (BPNA) as a petroleum trader.

I was promoted to co-book Leader in 2003 and as book leader in 2005. As a book leader, I led a team of BPNA and BPOI (UK bases) traders that were responsible for trading in particularized books of crude oil business, designated WAF (West African markets). As a book leader, I was compensated by a salary and an end of year bonus of that is derived from the profits obtained predominantly from the book of business I oversee. At all times while employed by BPNA in my capacity as a trader, and a book leader, I surpassed BPNA's performance benchmarks every year and in every respect and received substantial bonuses in addition to my annual salary.

In 2006, I again surpassed by performance benchmarks and, in addition to my salary of $160,000, was entitled to a bonus of $5.7 million. BPNA, however, deducted $760,000 from my bonus because BPNA claimed that financial goals my team achieved were based, in part, on what BPNA termed "soft money calculations", which it would not consider for purposes of calculating bonuses. BPNA, however, did not take this position with any of the other members of the US West African team, all of whom were males. I am the only female book leader (of sizable contribution to the BP trading bottom line) at BPNA, the only female member of the US based WAF team and the only female U.S market facing Crude trader at BPNA as of July of 2007. I believe BPNA singled me out for the "soft money calculations" solely because I am a woman.

BPNA discriminated against me as a woman in other ways as well. As a WAF book leader my compensation, including bonus, was approximately 3% of the profits the book of business made in a given year. I believe that during the same time period, male book leaders at BPNA were paid at least double for other books that were neither qualitatively or quantitatively different than my book. The dollar amounts attached to the difference in these percentages shows the severity of the discrimination levied on me.

When I was informed in March 2007 that my bonus would be reduced by $760,000, I voiced my concerns with how my bonus compensation was being calculated at BPNA in an e-mail sent to my supervisors in March of 2007. In what I believe was a retaliatory move by BPNA, I received a relatively unfavorable review in May of 2007 (for 1st quarter 2007), based not on any objective performance standards, which BPNA could not refute, but on what BPNA termed "behavior" issues which BPNA did not, and has never, specified further. Indeed in handing me my bonus letter my line manager and in further discussions after my email to them, his superiors all confirmed my impeccable behaviors. I had never received such a negative review before and, in fact, was awarded a bonus in excess of $2.7 million in 2006 based on my performance in 2005, of which in excess of $600k is still retained by BP and

- 1 -

which they now refuse to pay. The review I received in May of 2007 was only the second review I received in the entire 9 year span that I worked for BP or BPNA as a trader.

BPNA also retaliated against me when, in a meeting ostensibly called to go over various operational items; but instead attended by my immediate supervisor, his supervisors and the head of human resources on July 10, 2007; BPNA demanded my repatriation back to the United Kingdom by October 8, 2007. Although BP reserved the right to repatriate its employees who were sent to other countries for service, it did so in the course of its business only at the conclusion of Performance Agreements that were either negotiated yearly or every other year. My performance Agreement was not due to expire until, at the earliest, December 31, 2007.

BPNA knew that there was no need to repatriate me at all as my job could be fulfilled either here in the United States or in the United Kingdom since my team consisted of members residing in both the United States and the United Kingdom. BPNA, however, as part of its demand that I repatriate to the United Kingdom and in retaliation for my questioning the bonus calculation, took away all of my job responsibilities. BPNA personnel escorted me out of the building after the meeting on July 10, 2007 and refused to even let me return to my desk to collect personal items. I was escorted out the back door like a criminal.

BPNA placed me on what it termed "garden leave" during which I was not allowed to perform any of my job duties, and thus earn bonuses, was not allowed to seek employment elsewhere, and was not allowed to do anything other than access BP's job board to find another job in the United Kingdom in anticipation of my repatriation on October 8, 2007. Although BPNA and later BP acted as though the demanded repatriation was nothing out of the ordinary (notwithstanding the way I was escorted out of the building), BPNA and BP both knew that there were no similar jobs within the BP organization either in the United Kingdom or anywhere else. I was, effectively, terminated from my job as of July 10, 2007. Management immediately insisted to my team and broader trading and support group that they have no contact with me and if I tried to get in contact they should report the effort to their line managers immediately. None of this behavior is typical of BP repatriation process

In addition to precluding me from any opportunity to earn a performance bonus during the second half of 2007, BPNA refuses to compensate me for the bonus I earned during the first half of 2007. Based on the performance of the West Africa book as of July of 2007, the 2007 annual performance of this book would have at least met, and in all likelihood exceeded, the performance benchmarks reached in 2006. Thus, my bonus, which BPNA refuses to pay, would have amounted to at least $5.7 million for 2007. In addition, BPNA refuses to pay me for accrued bonuses earned in 2005 and 2006 that BPNA withheld as part of a deferred compensation plan to encourage retention. This amount totals in excess of $2.1 million.

I informed BPNA that I continued to be ready, willing and able to perform all of my job duties through at least December 31, 2007 if not longer and that I did not believe BPNA's demand for my repatriation during the middle of my Performance Agreement was justified, either factually or legally. BPNA retaliated against me for the third time when it terminated my employment on October 18, 2007 and continued its refusal to pay any of the bonus

- 2 -

monies outlined above. I am informed that BPNA replaced me with a male who has less experience West African trading than me and was not subject to any of the same "garden leave" requirements that BPNA demanded of me. Like me, he was a UK originated employee who will now relocate to Chicago after BP management approached him to take my position.

In addition, BPNA engages in sexual harassment against its female employees and creates a hostile working environment for them. Male employees in senior and managerial positions have made inappropriate comments to me and other females, and have exhibited inappropriate behavior during working hours and at BPNA business events.

I believe that I was discriminated against in violation of Title VII due to my sex, and that BPNA engages in sexual harassment against its female employees and creates a hostile working environment for them. I further believe that BPNA's activities described above, specifically its review in May of 2007, its placing me on "garden leave in July of 2007 and its terminating me in October of 2007 were all pretexts for BPNA's real goal, which was to silence me in retaliation for bringing to BPNA's attention the inequitable and discriminatory manner in which it compensates its female traders. I also feel that BPNA violated the Equal Pay Act due to its compensation of males in positions similar to mine that far exceed that which BPNA paid me over time.

Dated this 29th day of October, 2007.

_____
Alison Myers

- 3 -

# EXHIBIT

# B

| AMENDED   CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form. | AGENCY<br>FEPA<br>☒ EEOC | CHARGE NUMBER<br>440-2008-00596 |
|---|---|---|

| (State or Local Agency, If Any) | and EEOC |
|---|---|

| NAME (Indicate Mr., Ms., or Mrs.)<br>**ALISON MYERS** | HOME TELEPHONE NUMBER (Include Area Code) | |
|---|---|---|
| STREET ADDRESS<br>**57 E DELAWARE #2806** | CITY, STATE AND ZIP CODE<br>**CHICAGO IL 60611** | DATE OF BIRTH<br>**01/27/1972** |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below).

| NAME<br>**SEE BELOW** | NO. OF EMPLOYEES/MEMBERS<br>**37,000** | TELEPHONE NUMBER (Include Area Code)<br>**630-836-5000** | |
|---|---|---|---|
| STREET ADDRESS<br>**28100 TORCH PARKWAY** | CITY, STATE AND ZIP CODE<br>**WARRENVILLE IL 60555-4015** | | COUNTY |
| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER (Include Area Code) | |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST  **07/10/2007**  LATEST
☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s))

BP p.l.c.; BP AMERICA, INC.; BP PRODUCTS NORTH AMERICA, INC.

SEE AMENDED CHARGE OF DISCRIMINATION PARTICULARS - ALISON MYERS, ATTACHED AS EXHIBIT A.

| I want this charge filed with the EEOC and the State FEPA. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY — (When necessary to meet State and Local Requirements) |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 4/23/08 _(signature)_<br>Date   Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE:<br>(Month, day and year) |

THIS FORM PROVIDED FREE OF CHARGE BY WWW.EEOCOFFICE.COM

## AMENDED CHARGE OF DISCRIMINATION: PARTICULARS

### ALISON MYERS

I began working for BP p.l.c. (BP) at its London headquarters in 1996. My initial position was as an Operator. I progressed to the position of trader in 1998. In 2000 BP transferred me to Warrenville, Illinois where I continued my role for BP Products North America, Inc. (BPNA) as a petroleum trader.

I was promoted to co-book Leader in 2003 and as book leader in 2005. As a book leader, I led a team of BPNA and BPOI (UK bases) traders that were responsible for trading in particularized books of crude oil business, designated WAF (West African markets). As a book leader, I was compensated by a salary and an end of year bonus of that is derived from the profits obtained predominantly from the book of business I oversee. At all times while employed by BPNA in my capacity as a trader, and a book leader, I surpassed BPNA's performance benchmarks every year and in every respect and received substantial bonuses in addition to my annual salary.

In 2006, I again surpassed by performance benchmarks and, in addition to my salary of $160,000, was entitled to a bonus of $5.7 million. BPNA, however, deducted $760,000 from my bonus because BPNA claimed that financial goals my team achieved were based, in part, on what BPNA termed "soft money calculations", which it would not consider for purposes of calculating bonuses. BPNA, however, did not take this position with any of the other members of the US West African team, all of whom were males. I am the only female book leader (of sizable contribution to the BP trading bottom line) at BPNA, the only female member of the US based WAF team and the only female U.S market facing Crude trader at BPNA as of July of 2007.I believe BPNA singled me out for the "soft money calculations" solely because I am a woman.

BPNA discriminated against me as a woman in other ways as well. As a WAF book leader my compensation, including bonus, was approximately 3% of the profits the book of business made in a given year. I believe that during the same time period, male book leaders at BPNA were paid at least double for other books that were neither qualitatively or quantitatively different than my book. The dollar amounts attached to the difference in these percentages shows the severity of the discrimination levied on me.

When I was informed in March 2007 that my bonus would be reduced by $760,000, I voiced my concerns with how my bonus compensation was being calculated at BPNA in an e-mail sent to my supervisors in March of 2007. In what I believe was a retaliatory move by BPNA, I received a relatively unfavorable review in May of 2007 (for 1st quarter 2007) , based not on any objective performance standards, which BPNA could not refute, but on what BPNA termed "behavior" issues which BPNA did not, and has never, specified further. Indeed in handing me my bonus letter my line manager and in further discussions after my email to them, his superiors all confirmed my impeccable behaviors. I had never received such a negative review before and, in fact, was awarded a bonus in excess of $2.7 million in 2006 based on my performance in 2005, of which in excess of $600k is still retained by BP and

which they now refuse to pay. The review I received in May of 2007 was only the second review I received in the entire 9 year span that I worked for BP or BPNA as a trader.

BPNA also retaliated against me when, in a meeting ostensibly called to go over various operational items; but instead attended by my immediate supervisor, his supervisors and the head of human resources on July 10, 2007; BPNA demanded my repatriation back to the United Kingdom by October 8, 2007. Although BP reserved the right to repatriate its employees who were sent to other countries for service, it did so in the course of its business only at the conclusion of Performance Agreements that were either negotiated yearly or every other year. My performance Agreement was not due to expire until, at the earliest, December 31, 2007.

BPNA knew that there was no need to repatriate me at all as my job could be fulfilled either here in the United States or in the United Kingdom since my team consisted of members residing in both the United States and the United Kingdom. BPNA, however, as part of its demand that I repatriate to the United Kingdom and in retaliation for my questioning the bonus calculation, took away all of my job responsibilities. BPNA personnel escorted me out of the building after the meeting on July 10, 2007 and refused to even let me return to my desk to collect personal items. I was escorted out the back door like a criminal.

BPNA placed me on what it termed "garden leave" during which I was not allowed to perform any of my job duties, and thus earn bonuses, was not allowed to seek employment elsewhere, and was not allowed to do anything other than access BP's job board to find another job in the United Kingdom in anticipation of my repatriation on October 8, 2007. Although BPNA and later BP acted as though the demanded repatriation was nothing out of the ordinary (notwithstanding the way I was escorted out of the building), BPNA and BP both knew that there were no similar jobs within the BP organization either in the United Kingdom or anywhere else. I was, effectively, terminated from my job as of July 10, 2007. Management immediately insisted to my team and broader trading and support group that they have no contact with me and if I tried to get in contact they should report the effort to their line managers immediately. None of this behavior is typical of BP repatriation process

In addition to precluding me from any opportunity to earn a performance bonus during the second half of 2007, BPNA refuses to compensate me for the bonus I earned during the first half of 2007. Based on the performance of the West Africa book as of July of 2007, the 2007 annual performance of this book would have at least met, and in all likelihood exceeded, the performance benchmarks reached in 2006. Thus, my bonus, which BPNA refuses to pay, would have amounted to at least $5.7 million for 2007. In addition, BPNA refuses to pay me for accrued bonuses earned in 2005 and 2006 that BPNA withheld as part of a deferred compensation plan to encourage retention. This amount totals in excess of $2.1 million.

I informed BPNA that I continued to be ready, willing and able to perform all of my job duties through at least December 31, 2007 if not longer and that I did not believe BPNA's demand for my repatriation during the middle of my Performance Agreement was justified, either factually or legally. BPNA retaliated against me for the third time when it terminated my employment on October 18, 2007 and continued its refusal to pay any of the bonus

monies outlined above. I am informed that BPNA replaced me with a male who has less experience West African trading than me and was not subject to any of the same "garden leave" requirements that BPNA demanded of me.  Like me, he was a UK originated employee who will now relocate to Chicago after BP management approached him to take my position.

In addition, BPNA engages in sexual harassment against its female employees and creates a hostile working environment for them. Male employees in senior and managerial positions have made inappropriate comments to me and other females, and have exhibited inappropriate behavior during working hours and at BPNA business events.

I believe that I was discriminated against in violation of Title VII due to my sex, and that BPNA engages in sexual harassment against its female employees and creates a hostile working environment for them. I further believe that BPNA's activities described above, specifically its review in May of 2007, its placing me on "garden leave in July of 2007 and its terminating me in October of 2007 were all pretexts for BPNA's real goal, which was to silence me in retaliation for bringing to BPNA's attention the inequitable and discriminatory manner in which it compensates its female traders. I also feel that BPNA violated the Equal Pay Act due to its compensation of males in positions similar to mine that far exceed that which BPNA paid me over time.

Dated this 23 day of April , 2008.

Alison Myers

# EXHIBIT

# C

EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Alison Myers<br>57 East Delaware<br>#2806<br>Chicago, IL 60611 | From: | Chicago District Office<br>500 West Madison St<br>Suite 2800<br>Chicago, IL 60661 |
|---|---|---|---|

CERTIFIED MAIL: #7000 0600 0022 1012 5637

[ ] *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 440-2008-00596 | Robert Carmichael,<br>Investigator | (312) 886-7494 |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[X] More than 180 days have passed since the filing of this charge.

[ ] Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X] The EEOC is terminating its processing of this charge.

[ ] The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

[ ] The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ] The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

*John P. Rowe,*
**John P. Rowe,**
**District Director**

6/10/08
*(Date Mailed)*

cc:    BP AMERICA INC

| AMENDED    CHARGE OF DISCRIMINATION | | AGENCY | CHARGE NUMBER |
|---|---|---|---|
| This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form. | | FEPA ☒ EEOC | 440-2008-00596 |

| | (State or Local Agency, if Any) | and EEOC |
|---|---|---|

| NAME (Indicate Mr., Ms., or Mrs) ALISON MYERS | | HOME TELEPHONE NUMBER (include Area Code) |
|---|---|---|
| STREET ADDRESS 57 E DELAWARE #2806 | CITY, STATE AND ZIP CODE CHICAGO IL 60611 | DATE OF BIRTH 01/27/1972 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (if more than one list below).

| NAME SEE BELOW | NO. OF EMPLOYEES/MEMBERS 37,000 | TELEPHONE NUMBER (include Area Code) 630-836-5000 | |
|---|---|---|---|
| STREET ADDRESS 28100 TORCH PARKWAY | CITY, STATE AND ZIP CODE WARRENVILLE IL 60555-4015 | | COUNTY |
| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER (include Area Code) | |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☐ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST 07/10/2007   LATEST

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s))

BP AMERICA, INC.; BP PRODUCTS NORTH AMERICA, INC.

SEE AMENDED CHARGE OF DISCRIMINATION PARTICULARS - ALISON MYERS, ATTACHED AS EXHIBIT A.

| I want this charge filed with the EEOC and the State FEPA. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY — (When necessary to meet State and Local Requirements) |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 4/23/08    [signature] Date    Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE: (Month, day and year) |

THIS FORM PROVIDED FREE OF CHARGE BY WWW.EEOCOFFICE.COM

monies outlined above. I am informed that BPNA replaced me with a male who has less experience West African trading than me and was not subject to any of the same "garden leave" requirements that BPNA demanded of me. Like me, he was a UK originated employee who will now relocate to Chicago after BP management approached him to take my position.

In addition, BPNA engages in sexual harassment against its female employees and creates a hostile working environment for them. Male employees in senior and managerial positions have made inappropriate comments to me and other females, and have exhibited inappropriate behavior during working hours and at BPNA business events.

I believe that I was discriminated against in violation of Title VII due to my sex, and that BPNA engages in sexual harassment against its female employees and creates a hostile working environment for them. I further believe that BPNA's activities described above, specifically its review in May of 2007, its placing me on "garden leave in July of 2007 and its terminating me in October of 2007 were all pretexts for BPNA's real goal, which was to silence me in retaliation for bringing to BPNA's attention the inequitable and discriminatory manner in which it compensates its female traders. I also feel that BPNA violated the Equal Pay Act due to its compensation of males in positions similar to mine that far exceed that which BPNA paid me over time.

Dated this 23 day of April , 2008.

_____
Alison Myers

## PRIVATE SUIT RIGHTS:

This issuance of this Notice of Right to Sue ends EEOC's process with respect to your charge. You may file a lawsuit against the respondent named in your charge within 90 days from the date you receive this Notice. Therefore you should **keep a record of this date. Once this 90-day period is over, your right to sue is lost.** If you intend to consult an attorney, you should do so as soon as possible. Furthermore, in order to avoid any question that you did not act in a timely manner, if you intend to sue on your own behalf, your suit should be filed well **in advance of the expiration of the 90-day period.**

You may file your lawsuit in a court of competent jurisdiction. Filing this Notice is not sufficient. A court complaint must contain a short statement of the facts of your case which shows that you are entitled to relief. Generally, suits are brought in the state where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office.

You may contact EEOC if you have any questions about your rights, including advice on which court can hear your case, or if you need to inspect and copy information contained in the case file.

A lawsuit against a **private employer** is generally filed in the U.S. District Court.

A lawsuit under Title VII of the Civil Rights Act of 1964, as amended, against a **State agency or a political subdivision of the State** is also generally filed in the U.S. District Court.

However, a lawsuit under the Age Discrimination in Employment Act or the Americans with Disabilities Act or, probably, the Equal Pay Act against a **State instrumentality** (an agency directly funded and controlled by the State) **can only be filed in a State court.**

A lawsuit under the Age Discrimination in Employment Act or the Americans with Disabilities Act or the Equal Pay Act against a **political subdivision of the State,** such as municipalities and counties, may be filed in the U.S. District Court.

For a list of U.S. District Courts, please see reverse side.

**IF THE FIRST THREE CHARACTERS OF YOUR EEOC CHARGE NUMBER ARE "21B" AND YOUR CHARGE WAS INVESTIGATED BY THE ILLINOIS DEPARTMENT OF HUMAN RIGHTS (IDHR), REQUESTS FOR REVIEWING AND COPYING DOCUMENTS FROM YOUR FILE MUST BE DIRECTED TO IDHR.**

## ATTORNEY REPRESENTATION:

If you cannot afford or have been unable to obtain a lawyer to represent you, the court having jurisdiction in your case may, at its discretion, assist you in obtaining a lawyer. If you plan to ask the court to help you obtain a lawyer, you must make this request of the court in the form and manner it requires. Your request to the court should be made well before the end of the 90-day period mentioned above. A request for representation does not relieve you of the obligation to file a lawsuit within this 90-day period.

## DESTRUCTION OF FILE:

If you file suit, you or your attorney should forward a copy of your court complaint to this office. Your file will then be preserved. Unless you have notified us that you have filed suit, your charge file could be destroyed as early as six months after the date of the Notice of Right to Sue.

**IF YOU FILE SUIT, YOU OR YOUR ATTORNEY SHOULD NOTIFY THIS OFFICE IN WRITING WHEN THE LAWSUIT IS RESOLVED.**



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Chicago District Office

500 West Madison Street, Suite 2800
Chicago, IL 60661
PH: (312) 353-2713
TTY: (312) 353-2421
ENFORCEMENT FAX: (312) 886-1168
STATE & LOCAL FAX: (312) 353-4041
LEGAL FAX: (312) 353-8555

FILE REVIEWS FAX: (312) 353-4041
MEDIATION: (312) 353-6676
HEARINGS FAX: (312) 886-5391

# NOTICE OF DISCLOSURE RIGHTS

Parties to an EEOC charge are entitled to review and obtain copies of documents contained in their investigative file. Requests must be made in writing to Sylvia Bustos and mailed to the address above or faxed to **(312) 353-4041**.

If you are the Charging Party and a RIGHT TO SUE has been issued, you may be granted access to your file:

\*      <u>Before filing a lawsuit, but within 90 days of your receipt of the Right to Sue</u>, or

\*      <u>After your lawsuit has been filed.</u>  If more than 90 days have elapsed since your     receipt of the Right to Sue, include with your request a copy of the first page of your court complaint that shows the court docket number.

If you are the Respondent you may be granted access to the file **only after** a lawsuit has been filed. **Include with your request a copy of the first page of the court complaint that includes an official court stamped docket number.**

Pursuant to federal statutes, certain documents, such as those which reflect the agency's deliberative process, will not be disclosed to either party.

You must sign an Agreement of Nondisclosure before you are granted access to the file.  (Statutes enforced by the EEOC prohibit the agency from making investigative information public.)

Your request for access to the file will be acted upon no later than ten (10) days following receipt of your request.

When the file becomes available for review, you will be contacted.  You may review the file in our offices and/or request that a copy of the file be sent to you. Files may not be removed from the office.

Your file will be copied by **Aloha Document Services, 55 East Jackson Blvd., Suite 310, Chicago, IL 60604, (312) 542-1300.**   You are responsible for the copying costs and must sign an agreement to pay these costs before the file will be sent to the copy service. Therefore, <u>it is recommended that you first review your file</u> to determine what documents, if any, you want copied. EEOC will not review your file or provide a count of the pages contained in it. If you choose not to review your file, it will be sent <u>in its entirety</u> to the copy service, <u>and you will be responsible for the cost</u>.  Payment must be made directly to Aloha Document Services.

(Revised 02/04/08)

# EXHIBIT

# D

| From: | Myers, Alison J (CTR) |
|---|---|
| Sent: | Thursday, March 08, 2007 10:09 AM |
| To: | Milnes, Andy P |
| Cc: | Ross, Tom R (IST) |
| Subject: | 2006 performance |

Andy / Tom,

I am sorry to raise this topic with you at a time when I am sure that you are being harassed around trader bonus issues, but I feel that it is important that you know that my trading management has taken a highly controversial step in a direction that I feel certain is both morally questionable and patently unfair.

I will recap the issue here as quickly as possible but would welcome the chance to talk through my concerns with you face to face at your convenience.

*Some background;* .... The west African (waf) book touched about 180 million bbls of crude last year of which just under a third was BP equity from the region. The target for the book was set at $70m usd. The book after working capital / LIFO and loop costs returned almost exactly $115m usd. This is approximately 1.65x target and was a fantastic result for the team and BP. The book has been used as an example on multiple occasions as a book that has been built through hard work, perseverance and skillful trading over the last 5 years from a circa $20m usd book into a significant performance provider for BP. Well and truly this has been a good news story for IST and something for which I hold a great deal of personal pride.

*The issue;* ....It was therefore with a great deal of surprise that my local management informed me just yesterday that they intended to deduct approx $15m usd from the waf books performance just days before bonuses are paid for what they considered "soft money" on the book. The issue they quote is around how we purchase one of the BP equity Angolan grades that comes onto our book off an independently assessed argus benchmark. This is an issue that has been discussed at length with management for the better part of the year and myself and the traders on the book have spent a great deal of time explaining this issue to multiple parties including BPX and our local management. At ALL times the team has been open and honest about the issue and has provided significant efforts to measure the performance of this part of our business. No steps have been taken at any stage to cloud or confuse this issue by any member of the book at any time and I think the team has operated with the highest level of ethical behavior as you would expect with any BP employed trader.

*concerns;* ....

1/. My team of traders and I recently renegotiated our contracts for 2007 based on a target that once again has grown significantly to $90m usd. This target was based on performance of last year that included the pnl now in dispute. It smacks of back-trading by BP to retrospectively deduct performance from a book AFTER targets for the following year and bonuses are set especially when management was full aware of the issue PRIOR to setting the target.

2/. I would also like to question the ability BP has to sign contracts with traders based on a known and transparent set of financial parameters that it is fully aware of and then simply deduct performance because it is uncomfortable with some of the measures it has agreed. My deal for 2006 was indeed not agreed until May of 2006, more than mid way through the trading year. It is important to note that there is absolutely no suggestion of trader impropriety here and in fact my management yesterday confirmed with me that my "1/3 was not in any danger at all" and my behaviors and drives have been impeccable.

I would like you to consider what action BP would take against me if I negotiated a term deal with a repeat customer when I had privileged information that was pertinent to the deal, and I withheld from the customer until after they signed the deal and then declared that information to the customer. Firstly the customer would clearly be irate and the relationship would at best be tarnished. I also believe BP management would almost certainly tell me that that was not the way BP operates and potentially refer me to our business ethics policy. I would therefore like to understand why BP expects me not to react in the same manner when I have proved to be a long term and loyal staff member who has led a book that has grown immensely over the last 5 years.

Further to my above belief that the behavior is both unacceptable and unfair, and I have serious issues with the calculation that was made to assess the level of "soft money" resulting from this issue. Without going into great detail, the analysis that was done was at best incomplete and inaccurate and at worst exposed the significant lack of knowledge on the in depth detail of how the west African market operates and the drivers of performance on the book. I can provide significant further detail on this view and welcome the chance to explain in detail how the west African book drives unique performance and value for BP.

1

I do however have a great deal of sympathy for IST management who is invariably being questioned at the most senior level of BP about trader remuneration and the issue of soft money. I am more than happy to once again identify all sources of value and income that the waf book derives and help any effort by BP to determine what money is deemed soft versus hard. What do however have a massive issue with is the goalposts being moved mid game. Especially when this is done in a manner that makes me question the motivations and timings of managements decisions. I am very disappointed both with the position BP has taken in this issue but probably more important is the fact that I believe that it has been handled in an underhand and manipulative manner. This is not behavior I would have expected from BP management.

I welcome the opportunity to discuss this further at your earliest convenience.

Regards,

Alison Myers

This e-mail may contain confidential or proprietary information belonging to the BP group and is intended only for the use of the recipients named above. If you are not the intended recipient, please immediately notify the sender and either delete this email or return to the sender immediately. You may not review, copy or distribute this email. Within the bounds of law, this part of BP retains all emails and IMs and may monitor them to ensure compliance with BP's internal policies and for other legitimate business purposes.

# EXHIBIT

# E

**bp**



## Earl Burns

Foreign Crude Trading Manager
IST - Oil Americas

BP
28301 Ferry Road
Warrenville, IL 60555

Earl.Burns@bp.com
+1.630.915.4506

April 13, 2007

Alison Myers
IST-Oil Americas
28301 Ferry Road
Warrenville, IL 60555

Dear Alison,

Please accept this reward for the excellent job you did in describing book activities to the OA Compliance Team and to the IST Americas GVP in March and April. Trading Management is greatly appreciative to you for your efforts related to these important meetings.

You will receive a $250 American Express Gift Cheque in your next paycheck in appreciation for your efforts.

We personally thank you for your hard work for Oil Americas.

Warm Regards,

Earl

.cc Tom Ross