**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **ALISON MYERS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 08 C 3619** |
| ) | |
| **BP NORTH AMERICA, INC. and BP** ) | |
| **PRODUCTS NORTH AMERICA, INC.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY,  District Judge:

Alison Myers has worked for BP America, Inc. and BP Products North America,

Inc. (collectively, BP) since 1996.  She began her work at BP in the United Kingdom,

and in 2000, she was transferred to the BP offices in Warrenville, Illinois, where she

worked as a crude oil trader for the West African Crude Oil Bench (WAF Bench).  She

was promoted to "book leader" of the WAF Bench in 2005.  Myers was compensated

for her work with a base salary and a bonus linked to the performance of the WAF book

and her individual contributions.  In early 2007, Myers was told she would be receiving a

lower bonus for her 2006 work than she believed she had earned, and she complained

to upper level BP management about her bonus calculation.  In March 2007, Myers

received a negative performance review, and in July 2007 she was told that her

international assignment in the U.S. was being terminated, in part because of her

reaction to her 2006 bonus.  She was given three months to repatriate to the United Kingdom, and when she did not, she was terminated.

Myers contends that BP discriminated against her in several ways, including the calculation of her 2006 bonus, because she is a woman.  She further contends that BP gave her a negative review and subsequently fired her because she complained about the unfair calculation of her 2006 bonus.  She sues BP for sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a) & 2000e-3(a); violation of the Equal Pay Act, 29 U.S.C. § 206(d); breach of contract; and fraudulent misrepresentation.

## Factual Background

On a motion for summary judgment, the Court draws "all reasonable inferences from undisputed facts in favor of the nonmoving party and [views] the disputed evidence in the light most favorable to the nonmoving party."  *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2009).  The Court takes the following facts from the Myers' complaint and from the parties' statements of facts as to which there is no material dispute.

Myers began working for BP as an operator in its London office on November 11, 1996.  An operator schedules shipments of the petroleum products BP buys and sells.  On January 8, 1998, Myers was promoted to the role of Western Crude Oil Trader.  Traders are agents of BP who buy and sell petroleum products.  On July 8, 1999, Myers was promoted to Senior Crude Oil Trader.

Traders within BP are organized into regional and product-based groups, known as "benches."  The trading positions and other information related to each trading

2

bench are known as a "book."  In September 2000, pursuant to an "international assignment contract," Myers accepted an assignment that transferred her to BP's Warrenville, Illinois office, where she worked as a trader for the West African Crude Oil (WAF) bench.  Myers became the book leader of the WAF bench in 2005.  While acting as book leader, she continued to conduct trades.

Myers' compensation was made up of a base salary and a bonus.  The salary was paid over the course of the year.  The bonus was calculated at the end of each calendar year, based on a target established in a yearly performance contract.  A portion of the bonus was based on the book's financial performance, and a portion was based on "soft factors," such as "individual financial contribution to the book, innovation, delivery, teamwork, contribution to strategy, growth, coaching, and relationships." Appx. to Defs.' L.R. 56.1 Stat., Ex. 5.

In 2005, BP instituted a bonus retention program that applied to employees whose target bonus is $200,000 or greater.  Under the bonus retention program, seventy-five percent of a qualifying employee's bonus is paid to the employee no later than three months following the end of the year for which the bonus was awarded.  The remaining twenty-five percent of the bonus is paid out in three equal payments over the following three years, with an extra payment in the final year (twenty-five percent of the total retained amount).  To be eligible to receive retained payments, the employee must still be employed as of the date when the particular retained payment is disbursed.

In Myers' 2006 performance contract, the financial target for the WAF book was set at $70 million.  *Id*.  Myers' target bonus was set at $3.5 million.  *Id.*  Roughly two-thirds of Myers' target bonus, or $2.33 million, was calculated based on the WAF book's

attainment of its financial target. The remaining one third of her target bonus, or $1.16 million, was dependent on Myers' individual performance.

The WAF book made $110 million in 2006, substantially exceeding its financial target. One of the grades of oil that is part of the WAF book (Kissanje) is not a recognized oil grade in the market. To determine the appropriate value of oil of that grade when it was transferred among BP entities, BP historically used quoted values of a different grade of oil (Hungo) as an internal benchmark in the absence of a market price for Kissanje. In 2006, market conditions for these grades changed, and BP felt that the internal benchmark that it had been using was no longer appropriate and that internal trades of Kissanje were being overvalued. Traders, including Myers, provided the Head of Trading for Crude Oil, Tom Ross, with information about the differences between the two grades. Citing these market changes, Myers' trading manager, Earl Burns, recommended that the overall performance of the WAF book be adjusted downward by approximately $15 million, to $96 million, to reflect this market change.

In March 2007, Burns met with Myers to discuss her 2006 performance bonus. Myers received a total bonus of $4.8 million – the full $3.5 million that was established as the target in her performance contract, plus an additional $1.3 million based on the WAF book's above-target performance of $26 million (as calculated after making the Kissanje-Hungo adjustment discussed above).

Myers was displeased with this calculation of her bonus. Because her original bonus target was $3.5 million, or five percent of the $70 million WAF book financial target, she believed she was entitled a "straight-line" bonus worth five percent of the WAF book's performance as originally calculated, or $5.5 million. She felt that it was

unfair of BP to make a "retroactive" change to the WAF book's financial performance when it calculated her bonus. She further argued that Burns had made a mistake in his calculations when he adjusted the WAF's performance.

After her meeting with Burns, Myers sent an e-mail to Ross and Andy Milnes, the Head of Supply and Trading, challenging her 2006 bonus calculation. In the e-mail, Myers stated that she was very unhappy with the decision to adjust WAF book's performance for 2006 downward when calculating her bonus. She also told Ross and Milnes that she thought they should know about the decision, which she called "a highly controversial step in a direction that I feel certain is both morally questionable and patently unfair." She closed the e-mail with a request to speak further with Ross and Milnes about her 2006 bonus.

Both Ross and Milnes met with Myers to discuss the complaints she had raised in the e-mail, but they made no change to her 2006 bonus calculation. During the meeting with Ross and Milnes, Myers expressed her belief that she was being "targeted" by the use of the reduced WAF financial performance in calculating the amount of her bonus. She told Ross and Milnes that she believed she was the only one whose bonus was adjusted this way. She argued that bonuses for all traders on the WAF book should have been affected by the recalculation to the extent that their bonuses were linked to book performance. She did not say or suggest that she thought her gender was the reason for the adjustment. Myers also discussed with several other BP employees her displeasure over her bonus, including at least one conversation in which she told a colleague that management "stole" her money. Burns Dep. 257.

Burns recommended that BP's human resources department consider issuing a

disciplinary warning to Myers for "slandering" management in her e-mail and to other employees, but BP ultimately decided not to discipline her. *Id*. 241. Burns felt that Myers' behavior after the 2006 e-mail became difficult, and he testified that he heard complaints about Myers from at least three other BP employees, both on and off the WAF bench. *Id.* 253-60.

Burns expressed his frustration with Myers' post-e-mail behavior to other BP trading managers and to Ross. Ross also heard from at least one other employee who found Myers difficult to work with and said that he did not enjoy coming to work because of Myers' behavior on the bench. In response to Burns' complaints about Myers' behavior, Ross told Burns to draft a memo proposing a solution. On April 3, 2007, Burns circulated a confidential memo to all crude oil trading managers in which he recommended that Myers be removed from the WAF book leader position because of her behavior.

In March 2007, BP and Myers discussed Myers' performance contract for 2007. Myers signed the contract on March 30, 2007, after BP had told her that she would be denied access to trading materials and the BP system if she did not sign by that date. The 2007 performance contract included a financial target for the WAF book and bonus targets that were linked to book performance and individual performance. The 2007 performance contract also included language stating that "this performance contract does not alter or limit in any way the fundamental nature of the at-will employment relationship with BP." Appx. to Defs.' L.R. 56.1 Stat., Ex. 4.

In April 2007, Burns gave Myers a first quarter performance review, which he drafted with input from Ross and the BP human resources department. The review

called Myers' reaction to her 2006 bonus calculation "unprofessional" and "unacceptable." It also criticized her for sharing her displeasure over her 2006 bonus with her colleagues. The review stated that Myers needed to improve her relationships with other trading benches and support groups. Burns discussed the review with Myers and incorporated her comments into a final draft of the review. During that discussion, Myers again communicated her belief that she had been singled out for harsher treatment with respect to her 2006 bonus calculation, but she did not claim that this had been based on her gender. Myers Dep. 137, 142-43.

Burns says that he continued to receive complaints about Myers' behavior, a claim that Myers disputes. In July 2007, Burns discussed with Jennifer Pearce, a BP human resources advisor, how to address his concerns about Myers. On July 10, 2007, Burns, Ross, and Pearce met with Myers and informed her that BP was ending her international assignment. Myers Dep. 180; Burns Dep. 123-24. They told Myers that they were placing her on "garden leave," a three-month period during which she would not be required or permitted to work but would still be paid by BP. They also told Myers that to continue her employment with BP, she would have to repatriate to the United Kingdom within three months. They proceeded to escort Myers from the building. *Id.*

After the July 10, 2007 meeting, the human resources department sent Myers a letter explaining what she had to do to continue her employment, including repatriation to the United Kingdom within three months. Milnes notified BP in London that Myers was scheduled to repatriate.

Myers did not repatriate to the United Kingdom, and she did not seek another

position within BP because, in her view, there was no position comparable to the WAF book leader position that was open at the time. Myers Dep. 215. On October 18, 2007, BP terminated Myers' employment, citing her failure to repatriate to London by October 10, 2007 as it contends was required by the terms of her international assignment. Myers Dep. 223. BP did not pay Myers any bonus for her work in 2007, nor did it pay her the amounts retained from her 2005 and 2006 bonuses under the bonus retention program other than amounts that it had already disbursed before the date of her termination.

## Discussion

Myers asserts several claims against BP. In Count 1, she alleges that BP discriminated against her on the basis of sex in violation of Title VII. In Count 2, she alleges that BP retaliated against her for complaining about the calculation of her 2006 bonus in violation of Title VII. In Count 3, she alleges that BP paid male book leaders higher salaries and higher bonuses than female book leaders, in violation of the Equal Pay Act, 29 U.S.C. § 206(d). In Count 4, Myers alleges that she had a valid fixed-term employment contract for 2007 that entitled her to work for BP until December 31, 2007 and that BP breached the contract when it put her on garden leave on July 10, 2007 and when it terminated her on October 18, 2007. In Count 5, she alleges that BP breached her 2006 performance contract when it calculated her 2006 bonus using the downward-adjusted financial performance figure for the WAF book. In Counts 5 and 6, Myers alleges that BP breached her 2005 and 2006 performance contracts when it failed to pay her retained bonus amounts after she was terminated in October 2007. In Count 7, she alleges that BP fraudulently misrepresented its intention to employ her

through December 31, 2007 when it presented her with her 2007 performance contract, even though it knew when she signed the contract that it intended to terminate her before the term was up.

BP has moved for summary judgment on all of Myers' claims. For the reasons stated below, the Court denies summary judgment on Count 3 (the Equal Pay Act claim) and grants summary judgment for BP on all other counts.

## A.     Gender discrimination

Title VII prohibits employers from discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment on the basis of gender. 42 U.S.C. § 2000e-2(a)(1). Myers cites several examples of adverse employment actions that she contends constitute illegal gender discrimination by BP. These are the reduction of her 2006 bonus; the negative performance review in the first quarter of 2007; removal from her position as WAF book leader and the subsequent demand that she repatriate to the United Kingdom; non-payment of bonus money from her 2007 performance contract and money retained under the bonus retention program from her 2005 and 2006 performance contracts; damage to her reputation within BP and the larger petroleum trading industry; and failure to consider her for the Cushing book position when it became available.

### I.     Direct method

To prove discrimination, Myers may proceed under either the direct or indirect method.[1] The direct method of proof permits a plaintiff to show discrimination by

---

[1] Myers argues her claims only under the indirect method of proof, but given the
(continued...)

offering one of two types of evidence.  *Rogers v. City of Chicago*, 320 F.3d 748, 754

(7th Cir. 2003).  The first is direct evidence, which allows a reasonable juror to

conclude, without resorting to inference, that an employer acted for an illegal reason.

See *Velez v. City of Chicago*, 442 F.3d 1043, 1049 (7th Cir. 2006).  This type of

evidence "is essentially an 'outright admission' that a challenged action was undertaken

for one of the forbidden reasons covered in Title VII."  *Cardoso v. Robert Bosch Corp*.,

427 F.3d 429, 432 (7th Cir. 2005).  Myers does not offer any of this type of direct

evidence.

The second type of evidence that may be used under the direct proof method is

circumstantial evidence, which "allows a jury to infer intentional discrimination by the

decisionmaker."  *Rogers*, 320 F.3d at 754.  The Seventh Circuit has said that

circumstantial evidence of employment discrimination usually falls into one of three

categories:

> [1] suspicious timing, ambiguous statements oral or written, behavior toward or
> comments directed at other employees in the protected group, and other bits and
> pieces from which an inference of discriminatory intent might be drawn [;] . . .  [2]
> evidence, whether or not rigorously statistical, that employees similarly situated
> to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever)
> on which an employer is forbidden to base a difference in treatment received
> systematically better treatment[; and] . . . [3] evidence that the plaintiff was
> qualified for the job in question but passed over in favor of (or replaced by) a
> person not having the forbidden characteristic and that the employer's stated
> reason for the difference in treatment is unworthy of belief, a mere pretext for
> discrimination.

*Troupe v. May Dept. Stores*, 20 F.3d 734, 736 (7th Cir. 1994).

---

[1](...continued)
possibility of using circumstantial evidence under the direct method, the Court will
evaluate her claims under both frameworks in the interest of thoroughness.

Myers has not presented circumstantial evidence that would permit a reasonable trier of fact to infer intentional discrimination by BP. Myers argues that no other trader on the WAF book had his bonus adjusted because of the "Hungo/Kissanje differential." Pl.'s L.R. 56.1 Stat. ¶ 9. Reading broadly, this could be an argument that a reasonable jury could infer that BP treated male employees on the WAF book better than female employees on this subject. However, the evidence does not support the assertion that no one else's bonus was affected. Burns, in his deposition testimony, states that all members of the WAF team, including Myers, received bonuses that were above target in 2006, but no member of the WAF team had his or her bonus "straight-lined"[2] above targets. Burns Dep. 161, 164-65.

Myers offers no evidence contrary to that assertion. She presents deposition testimony of two other WAF employees who say that they believe, though they are not certain, that their 2006 bonuses were not adjusted. Casey Dep. 29, Taggart Dep. 34; *see also* Myers Decl. ¶ 31. One of these employees, Chris Taggart, testified that he did not receive a percentage of the WAF book as part of his bonus, so his bonus does not provide a meaningful basis of comparison. Taggart Dep. 34. Neither does Casey's testimony support an inference of discrimination. Casey testified as follows:

> Q.    How does your performance contract work? Were you given a target for which you would be paid some amount of bonus on top of a salary?"
>
> A.    I can't remember specifically for '06 because it's kind of changed a lot since  then. I don't recall. Generically it's set up in that type of way, yeah.

---

[2] "Straight-lining" refers to the process of calculating an employee's bonus as a percentage of the book's total performance, including any performance above target. Myers argues that her bonus should have been "straight-lined" at five percent of the WAF book's overall performance, without adjusting for the Hungo/Kissanje differential.

> Q.    Let me ask this.  For the year 2006 was your bonus reduced for any
>        reason?
>
> A.    Not to my knowledge.
>
> Q.    Were you told your bonus was affected for any reason having to deal with
>        the performance of the WAF book?
>
> A.    No.

Casey Dep. 29.  From this testimony, it is clear that Casey does not recall the

circumstances surrounding his 2006 bonus.  What is clear is that Casey does not say

that he was aware of any adjustment to his bonus based on the performance of the

WAF book.  That could be for any number of reasons, including the possibility that his

bonus (like Taggart's)  was not tied to book performance or that he did not challenge

the calculation of the amount above target his bonus ended up.  Based on this

testimony, a reasonable jury could not infer that BP treated Myers any differently in

calculating her 2006 bonus from the men on the WAF bench.

Myers also contends that she was passed over for the job as the leader of the

Cushing book (another, more profitable BP book) when the head of that book, Nick

Wildgoose, left BP.  She alleges that BP never posted the position internally and that

although she expressed interest in the position, BP hired a man.  BP contends that its

policies did not require it to post the position internally and that the man hired for the job

was more qualified than Myers because he had more experience working with the

Cushing book's products than Myers.  Weisz Dep. 189, 191.  Myers' own deposition

supports BP's contention that it did not follow a practice of posting open book leader

positions internally – Myers herself was made the WAF book leader without the position

being posted.  Myers Dep. 17.  Myers also admitted that she had no knowledge of any

book leader position ever being posted internally.  *Id.* at 18.  Myers does not address

this aspect of her claim in her summary judgment filings, and she has offered no

evidence to support an inference that she was "passed over in favor of (or replaced by)

a person not having the forbidden characteristic and that the employer's stated reason

for the difference in treatment is unworthy of belief, a mere pretext for discrimination."

*Troupe*, 20 F.3d at 736.

### 2.    Indirect method

To succeed under the indirect method of proving discrimination, Myers must

meet the requirements established by the Supreme Court in *McDonnell Douglas Corp.*

*v. Green*, 411 U.S. 792 (1973).  *McDonnell Douglas* and later cases have "'established

an allocation of the burden of production and an order for the presentation of proof in . .

. discriminatory-treatment cases'" involving indirect proof.  *Reeves v. Sanderson*

*Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*,

509 U.S. 502, 506 (1993)).  Under the indirect-proof method, Myers must first make out

a *prima facie* case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  For

summary judgment purposes, she must come forward with evidence from which a

reasonable jury could conclude that she belongs to a protected class; she performed

her job satisfactorily; she suffered an adverse employment action; and BP treated

similarly situated employees outside of her protected class more favorably.  *Stockett v.*

*Muncie Indiana Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000).

If Myers meets her burden of making out a *prima facie* case, the burden shifts to

BP to produce evidence that its actions were taken for a "legitimate, nondiscriminatory

reason."  *Reeves*, 530 U.S. at 142.  Once BP does this, any presumption of illegal

discrimination that arose from Myers' *prima facie* case disappears, *id*. at 142-43 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 510), and the ultimate burden of persuading the trier of fact that BP illegally discriminated falls on Myers' shoulders. *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). At the third stage of the *McDonnell Douglas* framework, Myers bears the burden of showing that the legitimate non-discriminatory reason proffered by BP is a pretext for gender discrimination. *Reeves*, 530 U.S. at 143.

> a. *Pre-e-mail actions*

The allegedly illegal actions taken by BP can be divided into two time periods: before and after Myers sent the e-mail complaining about her 2006 bonus. The Court considers these time periods separately because the analysis of some of the *McDonnell Douglas* framework factors differs for the different time periods.

The Court assumes for purposes of this discussion that Myers can meet the first three requirements to establish a *prima facie* case. Myers has failed to provide evidence from which a reasonable jury could find, however, that a similarly situated male employee was treated more favorably, as required by the fourth part of the *McDonnell Douglas* test. As discussed above, Myers has not offered evidence from which a reasonable jury could find that any male trader or book leader on the WAF bench received a bonus that, unlike hers, was straight-lined from the pre-reduction value of the WAF's 2006 financial performance.

Further, Myers has not offered evidence from which a reasonable jury could find that BP's cited reason for the recalculation of her bonus was a pretext for gender discrimination. BP maintains that it recalculated Myers' bonus not based on anything

14

she did, but because it had concluded that the internal valuation of the Hungo grade crude oil was incorrect and as a result, the book was overvalued. Burns Dep. 160. Once it had recalculated what it believed to be the correct valuation of the WAF book's financial performance for 2006, BP *did* straight-line Myers' bonus. Myers' bare assertion that BP undertook this action as a pretext for gender discrimination is unsupported by any evidence in the record. No reasonable finder of fact could find in her favor on the gender discrimination claim with regard to the 2006 bonus calculation.

　　　　　　b.　　*Post-e-mail actions*

Myers also argues that BP illegally discriminated against her on the basis of gender in several actions it took after her 2006 bonus was calculated, including giving her a negative performance review for the first quarter of 2007; removing her from her position as WAF book leader and subsequently demanding that she repatriate to the United Kingdom; not paying her any bonus for work done in 2007; and not paying her 2005 and 2006 bonuses that were retained pursuant to the bonus retention program after she was terminated in October 2007. The Court considers the termination first.

The parties hotly contest whether Myers was performing satisfactorily when she sent the e-mail complaining about her bonus and afterwards when she complained to her co-workers and allegedly became difficult to work with. BP does not contend that Myers' performance of her job duties was in any way deficient. Rather, it argues that Myers behaved in a manner that was unprofessional and damaging to the WAF team and to BP more broadly, contrary to its expectations for employee behavior.

BP contends that Myers' behavior in the wake of her receipt of her 2006 bonus was unacceptable. It contends that the e-mail Myers sent to Ross and Milnes was

unprofessional and slanderous.   Burns Dep. 240-41; Milnes Dep. 60.  Burns testified
that he believed that Myers had discussed her bonus adjustment with other members of
her team, accusing management of stealing her money, and calling them "shit."  Burns
Dep. 255.

BP further argues that Myers' behavior on the bench deteriorated after she was
informed of her 2006 bonus.  It contends that it had hired a professional coach to work
with Myers in 2005 and that after working with the coach, Myers' behavior improved.
After the 2006 bonus discussions, however, BP says that Myers' behavior began to
regress.  *Id.* 253-60.  BP managers testified that they had been told by other members
of the WAF bench that Myers was difficult to work with and that they did not enjoy
coming to work.  Ross Dep. 60; Melville Dep. 16.  BP argues that Myers deliberately
held out on signing her 2007 performance contract because she was still angry about
the 2006 bonus.  BP contends that it put Myers on garden leave, and eventually
terminated her, as a direct result of these actions on her part.

In addressing these arguments, Myers invokes the fourth part of the *McDonnell
Douglas* test and argues that she was no more difficult to work with than several male
traders and book leaders.  These other traders, she contends, also had a reputation for
being difficult but were not fired as a result.  To support this argument, Myers cites
deposition testimony of several BP employees who testified that other BP book leaders
and traders were "difficult," "volatile," and "perfection driven."  Taggart Dep. 25, 44,
Weisz Dep. 45-46.

In her own deposition testimony, however, Myers admitted that she knew of no
other BP employee who had accused management of being unethical or morally

questionable, as she did in her e-mail to Ross and Milnes. Myers Dep. 80. In her declaration, Myers states that several male employees were "verbally critical of BP's management," but she offers no facts to support this assertion. Myers Decl. ¶ 67. Uncorroborated allegations such as those in Myers' declaration are insufficient to avoid summary judgment. *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 429 (7th Cir. 2004); *Oest v. Illinois Dep't. of Corr.*, 240 F.3d 605, 614 (7th Cir. 2001). Myers has failed to provide evidence from which a reasonable jury could find that similarly-situated male employees were treated more favorably. For this reason, she has not cleared the *prima facie* case hurdle.

In her complaint, Myers also alleges that BP discriminated against her on the basis of gender when it refused to pay after her termination the portions of her 2005 and 2006 bonuses that had been retained under BP's bonus retention program. Myers alleges that BP did continue to pay retained bonus amounts to one male employee, Nick Wildgoose, after he left BP. But BP has presented evidence, which Myers does not contest, that Wildgoose negotiated to continue to receive his retained bonus benefits as part of a severance package and that the bonus was given to him due to a negotiated deal, not as a matter of course. Milnes Dep. 119; Pearle Dep. 32-33. As a result, no reasonable factfinder could find that he and Myers were similarly situated for this purpose.

Myers cites several other adverse employment actions in Count 1. She contends that BP did not follow its own internal policies when it "refused to consider" her for the Cushing book leader position. As discussed above, Myers does not address this claim in her summary judgment filings and offers no evidence to contradict BP's

contention that it followed its internal policies and hired someone for the position who had more relevant experience than Myers. In addition, Myers' own role as WAF book leader was given to her without an internal posting. Myers Dep. 19.

Myers also argues that BP escorted her from the building when it put her on garden leave, thereby damaging her reputation within the company and the industry, and that she had a fixed term contract that entitled her to work through December 31, 2007 that BP failed to honor when it did not pay her for any work after October and did not pay her any bonus for 2007. She does not offer any evidence, however, suggesting that similarly situated male employees were treated more favorably on any of these points, so the Court has considered these allegations only as part of the broader discussion about the legality of her termination.

Because Myers has failed to meet her burden of presenting a triable issue of fact on any of her sex discrimination claims under either the direct or indirect methods of proof, the Court grants BP's motion for summary judgment as to Count 1.

## B.    Retaliation

In Count 2 of her complaint, Myers alleges that she was terminated in retaliation for complaining about her 2006 bonus. A threshold requirement under both the direct and indirect methods of proving retaliation is a showing that the plaintiff engaged in expression protected under Title VII. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663, 666 (7th Cir. 2006).

Myers contends that she engaged in protected expression when she questioned, opposed, and complained of BP's calculation of her 2006 bonus, which she perceived as singling her out, or "targeting" her. Milnes Dep. 47, Ross Dep. 91, 99-100; Pl.'s Am.

Compl. ¶ 74. But in neither her e-mail nor her meeting with Ross and Milnes did Myers refer, even indirectly, to gender when claiming that she was singled out. Myers Dep. 142-43. This is fatal to her retaliation claim. "An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints." *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000). The Court grants summary judgment for BP on Count 2.

## C.   Equal Pay Act

In Count 3 of her complaint, Myers alleges that she was paid less than male book leaders in the Warrenville office and elsewhere within BP, in violation of the Equal Pay Act. The Equal Pay Act makes it illegal for employers to pay men and women differently "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (I) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d).

To prove a violation of the Equal Pay Act, Myers must first establish a *prima facie* case of unequal pay by showing that she was compensated differently than a male employee; she and the male employee performed equal work requiring equal skill, effort, and responsibility; and they had similar working conditions. *Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 698 (7th Cir. 2003). Myers contends that she was paid less than male book leaders and crude traders in BP's Warrenville office and elsewhere within the organization, even though their positions required equal work and were

19

performed under similar working conditions.

BP focuses initially on the second part of the test for establishing a *prima facie* case. Myers contends that she and other book leaders within BP performed work requiring equal skill, effort, and responsibility. BP contends that the "male comparables" Myers identifies substantially differ from her in terms of skill level and responsibility despite the fact that their positions and Myers' have the same title.

A plaintiff must show that the job to which she is comparing her own is substantially equal, "based upon 'actual job performance and content - not job titles, classifications or descriptions.'" *EEOC v. Mercy Hosp. and Med. Ctr.*, 709 F.2d 1195, 1197 (7th Cir. 1983) (citations omitted). "In determining whether two jobs are equal, the crucial inquiry is 'whether the jobs to be compared have a 'common core' of tasks, i.e., whether a significant portion of the two jobs is identical.'" *Cullen*, 338 F.3d at 698 (citing *Fallon v. State of Illinois*, 882 F.2d 1206, 1209 (7th Cir. 1989)). If a common core of tasks exists, a court must then ask whether any additional tasks make the jobs "substantially different." *Id.*

Myers identified several traders and book leaders whom she considered her "comparables," including Wildgoose, Hunt, Porteus, and Begg.[3] Myers Dep. 269. All book leaders and traders engage in trades of crude oil to try to maximize profit for BP. The common core of the positions held by Myers and the men who she has identified as comparables suggests that the jobs are equal. Nevertheless, the jobs of the male

---

[3]Myers also alleges that she was paid less than Pablo Gallante when he was the co-head of the WAF book with her prior to 2005. She offers no evidence of this, however, and even if she did, the claim is time-barred. There is a two year statute of limitations on Equal Pay Act claims. 29 U.S.C. § 255(a).

traders who, according to the evidence, made more money than Myers and traded more in a more fast-paced and complex environment (paper vs. physical trading, explained below), which required significant additional responsibility.

BP argues that other books made more money than the one Myers worked. There are cases that indicate that significant differences in financial performance may render jobs unequal for purposes of the Equal Pay Act. But those cases involve very significant disparities in performance, much greater than is claimed in this case. See *Cullen*, 338 F.3d at 700 (six to one ratio, with the higher-revenue program generating thirty percent of overall tuition revenue); *Stanley v. Univ. of Southern California*, 13 F.3d 1313, 1322-23 (9th Cir. 1994) (ninety to one ratio). The Court is not prepared to say that the much smaller disparity in this case is sufficient to make the jobs unequal as a matter of law.

BP also argues that Myers' job as the WAF book leader requires less skill and effort than the book leader position of some of the other books. BP trades in both "paper" and "physical" books. A paper book is one that trades in paper exchange instruments. Physical books trade in physical crude oil and cargo ships. Though some books involve both kinds of trading, the WAF book is primarily a physical book, and the Cushing book, for example, is primarily a paper book. Ross Dep. 88. Not surprisingly, paper books tend to involve more trades, at a faster pace, than physical books. BP therefore argues that paper-dominant books require traders and book leaders to have more skill and expend more effort, and that as a result, the jobs are not similar. Myers replies that all of the books in question have some paper and some physical components.

As the Court has noted, the test for establishing a prima facie case under the Equal Pay Act requires that the jobs being compared are "substantially equal." Substantially equal does not mean identical; "roughly" the same appears to suffice. See *Sims-Fingers v. City of Indianapolis*, 493 F.3d 768, 772 (7th Cir. 2007).

Both sides have presented cogent arguments supporting their contentions that Myers' position did or did not involve substantially equal skill, effort, and responsibility from the positions of the allegedly comparable male traders. In the Court's view, resolution of these competing arguments involves weighing of evidence, sifting of facts, and drawing of inferences, all of which make the inquiry (in this case at least) inappropriate for summary judgment. The same is true regarding BP's contention that it is entitled to prevail on one or more of the affirmative defenses set forth under the Equal Pay Act (the Court also notes that because those are affirmative defenses, BP bears the burden of persuasion, making its case for summary judgment even tougher). See 29 U.S.C. § 206(d). The Court therefore declines to enter summary judgment in BP's favor on Count 3.

**D.     Breach of 2007 performance contract**

On March 30, 2007, Myers signed a performance contract for 2007. Myers argues that this performance contract was for a fixed term, effective from January 1, 2007 to December 31, 2007. Myers contends that she performed all of her obligations under the 2007 performance contract until July 10, 2007, when she was placed on garden leave and escorted from BP's Warrenville office. Myers argues that BP's decisions to place her on garden leave, order her to repatriate to the United Kingdom,

and eventually terminate her violated the terms of her 2007 performance contract.

BP argues that its termination of Myers' employment did not run afoul of any contract. It relies primarily on language in what it calls Myers' "2007 contract" to the effect that either party had the right "to terminate the employment relationship at any time, with or without cause, and with or without prior notice." Appx. to Defs.' L.R. 56.1 Stat., Ex. 4. BP also contends that it was entitled to put Myers on garden leave and require her to repatriate to the UK "pursuant to the notice provision in her intentional assignment contract." Defs.' Mem. in Support of Mot. for Summ. J. at 13. By this latter statement, BP indicates that it contends that Myers' international assignment contract was still in effect as of 2007.

Myers contends that as of March 2005, she worked for BP pursuant to annual fixed-term performance contracts, the last of which was a one-year contract for the 2007 calendar year. Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. at 8. According to Myers, the 2007 performance contract did not create an at-will relationship but rather simply said that it did not alter any prior at-will relationship. *Id.* Because she was not previously an at-will employee, Myers argues, the 2007 performance contract did not make her one. *Id.* She also argues that several BP management personnel treated her as if she was on a fixed-term contract and testified that is what they understood; this, Myers argues, supports her interpretation of the contract. *Id.* at 9-10. Myers also argues that even if the 2007 performance contract may be read to make her an at-will employee, this change was unsupported by any consideration and is thus not binding. *Id.* at 9.

23

Because she was a fixed-term contract employee, Myers argues, BP was not entitled to put her on garden leave or require her to repatriate to the UK in July 2007. At that point, she says, there was still time remaining on her one-year contract term. *Id.* at 10. Myers likewise argues that the company was not entitled to terminate her employment in July 2007 and that as a result, she is entitled to all amounts payable under the 2007 performance contract as damages for the breach. *Id.*

In the Court's view, both sides' briefs make somewhat of a muddle of the contract claims. The Court has done its best to sort things out.

The 2007 performance contract included the following language:

> For those employees situated in the United States: This Performance Contract does not alter or limit in any way the fundamental nature of the at-will employment relationship with BP; and that you and BP have the right to terminate the employment relationship at any time, with or without cause, and with or without prior notice.

Appx. to Defs.' L.R. 56.1 Stat., Ex. 4 at 3. The Court agrees with Myers that this language reasonably may be read to provide that if Myers had an at-will relationship before, the performance contract did not change it. By the same token, however, nothing in the performance contract created a fixed-term employment relationship if one did not exist before. No language in the performance contract suggested anything along those lines. All it said about termination was that BP could terminate its relationship with Myers at any time and for any reason.

Myers somewhat inexplicably argues that she had no contractual relationship with BP at the time of her termination other than the 2007 performance contract. To quote her response to BP's summary judgment motion: "Since March of 2005 Myers

has been operating solely under the yearly Performance Contracts." Pl.'s Mem. in Opp. of Defs.' Mot. for Summ. J. at 8. In other words, Myers has clearly staked out a position that the only contract she had in 2007 was the performance contract itself.

Given the language quoted above, the performance contract cannot reasonably be read to create a fixed-term employment relationship. Indeed, the contrary is true. The performance contract expressly permitted BP to terminate Myers "at any time, with or without cause, and with or without prior notice." Appx. to Defs.' L.R. 56.1 Stat., Ex. 4.[4]

As indicated earlier, in its memorandum in support of summary judgment, BP appears to contend that it considered Myers still to be operating under the international assignment contract as of 2007. This, too, is rather inexplicable – Myers, the plaintiff, says she only had one contract, but BP, the defendant, says she had two. But even if BP is right that the international assignment contract remained in effect as of 2007, that contract likewise permitted the company to terminate Myers' assignment to the BP North America entities at any time and for any reason. An attachment to the contract stated that the "period of international assignment" (starting in September 2000) was "[a]pproximately 35 months," Appx. to Defs.' L.R. 56.1 Stat., Ex. 3, but the body of the contract stated that Myers

> agree[s] and acknowledge[s] that this period is not a fixed term. It may be reviewed by the Employing Company at any time and reduced or extended either sic], in the light of changing business circumstances and

---

[4] The Court also rejects Myers' "lack of consideration" argument. She has pointed to no evidence permitting a reasonable finding that she had anything other than an at-will relationship prior to the 2007 performance contract.

> the continuing need for the Employing Company to so assign you or by reason of paragraph 19 of this letter, in which event you will not be entitled to receive any compensation or additional remuneration of any kind by reason only of such reduction or extension.

*Id*. ¶ 6.

In other words, the international assignment contract did not create a fixed-term agreement. Rather, it entitled BP to end Myers' overseas assignment to the BP North America entities at any time. The contract required only that the company give Myers three months' notice, a requirement that BP indisputably met.

In sum, Myers has offered no evidence from which a jury reasonably could find that BP violated the performance contract or, for that matter, the international assignment contract when it placed her on leave and terminated her assignment. Neither agreement created anything other than an at-will employment relationship.

The Court would be remiss if it did not point out that there is potentially one other contract in play here that neither side has focused upon. The international assignment contract provided that if BP terminated Myers' international assignment, the company "reserve[d] the right to consider the termination of [her] Contract with [BP] in accordance with [its] terms and conditions." *Id.* ¶ 22. The international assignment contract also provided that on termination of Myers' international assignment, "the terms of [her] Contract will apply as if [she] had never undertaken an international assignment unless [her] Contract is terminated at the same time as [her] international assignment." *Id.* ¶ 23. The international assignment contract's reference to Myers' "Contract" is to her "Trader Fixed Term Employment Contract" dated January 1, 1999. *Id.*, p. 1.

The upshot seems to be that if BP terminated Myers' international assignment contract, her status with the company would revert back to her 1999 contract. Neither side has told the Court anything about that contract, and as best as the Court can determine, neither side has provided a copy of it. But because Myers does not contend, or even hint, that anything BP did contravened the 1999 contract, that contract provides no basis for a viable claim in the present case.

In sum, BP is entitled to summary judgment on Myers' breach of contract claims regarding the company's decisions to place her on leave and to terminate her.

### E.   Breach of 2006 performance contract based on bonus reduction

Myers alleges that BP breached her 2006 performance contract when it failed to pay her five percent of the WAF book's total, unadjusted financial performance. According to Myers, her bonus target of $3.5 million represented five percent of the $70 million performance target established for the WAF book as a whole. Therefore, she argues, "it was understood" that she was entitled to five percent of any amount by which the WAF book's performance exceeded its target. As discussed above, the total financial performance of the WAF book was $110 million. Therefore, Myers calculates, she was entitled to a bonus of $5.5 million. By paying her only $4.8 million, she argues, BP breached the 2006 performance contract.

The parties agree that prior to 2006, Myers had received a straight-lined bonus for any amount by which the WAF book performance exceeded its target. Myers Dep. 25-27; Pl.'s L.R. 56.1 Stat. ¶ 8. Despite BP's practice in prior years, however, Myers has failed to submit any evidence that would allow a reasonable factfinder to conclude

that she was entitled to a straight-lined bonus in 2006. Nowhere does the 2006 performance contract does it say that Myers was entitled to any bonus above the target if the book exceeds its financial targets, let alone that she was entitled to a straight-lined bonus.[5]  The 2006 performance contract clearly states that bonuses, even those within the target established by the contract, are ultimately within BP's discretion. Appx. to Defs.' L.R. 56.1 Stat., Ex. 5.

The 2006 performance contract states that it is to be interpreted under Illinois law. *Id.*  Under Illinois law, the interpretation of legal effect of a contract is ordinarily a question of law to be determined by the court. *Bowers Mfg. Co. v. Chicago Mach. Tool Co.*, 117 Ill. App. 3d 226, 232, 453 N.E. 2d 61, 66 (1983).  When the terms of a contract are clear, "they must be enforced as written." *Frederick v. Prof. Truck Driving Training Sch., Inc.*, 328 Ill. App. 3d 472, 481, 765 N.E.2d 1143, 1152 (2002).  The 2006 performance contract clearly states that the decision to award bonuses, and in what amounts, lies within the full discretion of BP, even if "business results would otherwise justify a payment under the plan."  Appx. to Defs.' L.R. 56.1 Stat., Ex. 5.  Myers' argument is essentially that business results (the initially-calculated performance of the WAF book) justified a higher bonus than she actually received in 2006.  That decision, per the contract, is clearly within the discretion of BP, and no reasonable finder of fact could find otherwise.

---

[5] Interestingly, Myers *was* paid five percent straight-lined bonus for the above-target performance of the WAF book.  She merely objects to BP's decision to adjust the "performance" of the book to reflect the fact that it believed the original figure to be inflated.

**F.      Other breach of contract claims**

Myers also claims that BP breached her 2005, 2006, and 2007 performance contracts by failing to pay her any bonus after she was terminated.  She contends that when BP allegedly illegally terminated her in 2007, it paid her no bonus for her 2007 work and stopped paying her payments from her 2005 and 2006 bonuses pursuant to the bonus retention program.  BP argues that pursuant to the terms of the retained bonus agreement, Myers was not eligible for such payments because she was not employed on March 31 of each year that the retained amounts became payable.  Myers concedes this but argues that the reason she was not employed as of those dates was that BP breached her 2007 contract.  Because the Court has already determined that summary judgment in BP's favor is appropriate on the 2007 breach of contract claim, Myers' other breach of contract claims fail.  Myers also briefly argues that she should receive her retained bonus payments anyway, because another departed BP employee, Nick Wildgoose, received his retained bonus payments after leaving BP.  As discussed above, however, Myers has presented no evidence to rebut BP's assertion that payment of his retained bonus amounts was a part of a separately-negotiated contract with BP.

**G.      Fraudulent inducement claim**

Myers' final claim is that BP fraudulently induced her to sign the 2007 performance contract despite the fact that when she signed it, plans to terminate her were already in the works.  Myers argues that when BP entered into the 2007 performance contract with Myers, it did not intend to honor its promises to her and

never intended to pay her the target bonus established in the contract, because it intended all along to terminate her before the bonus was due. Myers argues that she suffered damage in the amount of lost salary and bonus for the portion of 2007 after she was terminated, "both of which represent the value of her performance under the 2007 performance contract." Compl. ¶ 144.

Promissory fraud generally is not actionable in Illinois, but there is an exception to this rule "where the false promise or representation of intention of future conduct is the scheme employed to accomplish the fraud." *Steinberg v. Chi. Med. Sch.*, 69 Ill. 2d 320, 333, 371 N.E.2d 634, 641 (1977). The scheme exception applies where "a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where the other party relies on it to his detriment." *Concord Indus., Inc. v. Marvel Indus. Corp.*, 122 Ill. App. 3d 845, 849-50, 462 N.E.2d 1252, 1255 (1984)

Myers' case presents facts similar to those in *Bower v. Jones*, 978 F.2d 1004, 1011-12 (7th Cir. 1992). In *Bower*, the plaintiff alleged fraudulent inducement, claiming that his employer induced him to sign an employment contract with a promise to employ him for a full year when it did not intend to do so. The court found that "it is true that the defendants did not employ [plaintiff] for a full year, but that alone is insufficient to make out a claim of promissory fraud, since there is no proof that the defendants made the promise never intending to keep it. Without 'specific, objective manifestations of fraudulent intent' there can be no promissory fraud." *Id.* (citing *Hollymatic Corp. v. Holly Sys., Inc.*, 620 F. Supp. 1366, 1369 (N.D. Ill. 1985)). The court held that because the

plaintiff had not "pointed to any specific manifestations of fraudulent intent . . . [and instead] bas[ed] his argument on circumstantial evidence and inference," summary judgment for the defendant was appropriate. *Id*.

As discussed above, no reasonable trier of fact could conclude that the 2007 performance contract constituted a fixed-term employment contract that entitled Myers to employment through December 31, 2007, or, by extension, to the bonus she would get if she was still employed as of that date and WAF met its financial targets. Myers contends that she reasonably relied on the fact that she had been employed for the entire term of her previous contracts, with accompanying payment of bonus, to conclude that the same would be true with respect to the 2007 contract. The terms of the 2007 contract clearly establish, however, both that bonuses are discretionary and that the performance contract does nothing to change the underlying status of the employee's relationship with BP. No reasonable trier of fact could conclude that because Myers had been employed for all of 2005, or all of 2006, she could assume, absent some affirmative representation (which she does not allege) that by signing the 2007 performance contract she was entitled to a full year of work and full payment of a bonus. This is fatal to Myers' fraudulent inducement claim. Summary judgment on this claim is appropriate.

## Conclusion

For the foregoing reasons, the Court grants defendants' motion for summary judgment (docket no. 84) on all of plaintiff's claims except Count 3, her Equal Pay Act claim. The final pretrial order is to be filed by April 14, 2010. The case is set for a final

pretrial conference on April 21, 2010 at 3:30 p.m.  The case is also set for a status

hearing on March 17, 2010 at 10:00 a.m. to discuss the anticipated length of trial in light

of the summary judgment ruling as well as the possibility of settlement.

_____<br>
MATTHEW F. KENNELLY<br>
United States District Judge

Date:  March 11, 2010